**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4894-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GEORGE M. BALLOUTINE,

     Defendant-Appellant.

_____

> Submitted September 14, 2020 – Decided October 5, 2020
>
> Before Judges Sabatino and DeAlmeida.
>
> On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-03-0497.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Alyssa Aiello, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

Tried by a jury, defendant George M. Balloutine was found guilty of third-degree distribution of a controlled dangerous substance ("CDS"), specifically testosterone propionate, N.J.S.A. 2C:35-5(a)(1) and -5(b)(13) (count one); third-degree possession of testosterone propionate, N.J.S.A. 2C:35-10(a)(1) (count two); third-degree distribution of another CDS, heroin, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3) (count 3); and third-degree possession of heroin, N.J.S.A. 2C:35-10(a)(1) (count four).

The trial court sentenced defendant on count three to an extended term of seven years with a three-year parole disqualifier, and a concurrent term of four years on count one. The other counts merged for sentencing purposes.

In this direct appeal, defendant principally challenges the sufficiency of the identification evidence presented by the State, and the incompleteness of the charges on identification the court provided to the jury. Defendant also contends that the trial court prejudicially allowed a testifying detective to convey hearsay information from others without an opportunity for those declarants to be cross-examined.

Lastly, the State points out in its brief that duplicative fines and penalties were imposed on the two merged counts, and that the judgment of conviction should be amended accordingly.

A-4894-17T4

For the reasons that follow, we vacate defendant's convictions and remand for a new trial because of critical omissions from the jury charge on the pivotal identification issues in this case.

I.

The State's proofs at trial may be summarized as follows. In essence, the State's theory of the case was that defendant was a drug dealer who had been referred to by a confidential informant as a man named "George." The State further established that an undercover officer from the county prosecutor's office purchased steroids from a person believed to be "George" on one occasion and purchased heroin from the same man five days later. Defendant contended that he had been mistakenly identified as the drug-dealing "George," and presented three alibi witnesses who testified defendant had been with relatives on the evening of the second drug sale.

The State's key witness was the undercover detective who had purchased the steroids and heroin. During his testimony, the detective recounted that on June 17, 2015, he had "received information" from a confidential informant that a person named "George" had been illegally selling drugs, and that the seller lived at a certain address on Clark Street in Garfield. The detective was not supplied with any additional identifying information at that time.

The undercover detective then went with the informant to the Clark Street address. He told the informant to contact "George" and let him know a drug purchaser was outside. The informant made that call as requested, in the detective's presence, and then left the detective's vehicle.

A few minutes later, a man described by the detective in his report as a "middle-aged" white male with gray and black hair wearing a hat, emerged from the building and got into the detective's car. According to the detective, he told the man he wanted to buy steroids from him. The man handed him the steroids in exchange for $430. Before the man left the car, the detective told him he wanted to buy more drugs from him in the future.

After this June 17 drug purchase, the undercover detective that same day went back to the prosecutor's office to try to ascertain the name of the "George" who had sold him the steroids. He conducted what he termed "an in-house inquiry," and obtained the names of persons who resided at the Clark Street residence. The detective was advised by a Garfield police officer that a person named George Balloutine resided there. The detective entered that name into a database of driver's licenses, and pulled up a color photograph of George Balloutine. According to the detective, the license photo appeared to match the person who had sold him the steroids. As we will discuss, infra, in Part II, the license photo was not introduced into evidence at trial.

The detective then arranged a second meeting to purchase a different drug, this time heroin. He made the arrangements directly himself by calling a cell phone number that subsequently proved to belong to defendant. According to the detective, he and the seller agreed to meet on June 22 outside the same Clark Street address. This time, the detective was equipped with an audio recorder.

When he arrived for the second meeting, the detective called the cell phone number again. According to the detective, the same person who he had bought drugs from on June 17 emerged from the building, again wearing a hat. The man got into the detective's car. The detective said he wanted to buy a large quantity of heroin to sell to others.

After discussion, the suspect agreed to obtain a sample of heroin for the detective. Later that evening on June 22, the detective returned to the Clark Street residence, from which the same suspect emerged. The suspect got into the detective's car and gave him, without receiving payment, three packets of heroin to sample. At that point, the suspect left the car and the detective drove away.

The detective returned to his office, where he field-tested the substances. He also downloaded the audio recording of his two meetings with the seller that day. The detective testified that a voice on the recordings was the same voice of the man who had given him the drugs. Laboratory tests by the State Police

confirmed that clear liquid in the vials was testosterone propionate, and the product in the glassine packets was heroin.

Defendant was subsequently arrested eighteen months later and charged with the various CDS offenses we have already noted.

At the ensuing trial, the State presented testimony from the undercover detective, who described his investigation and his interactions with the informant and the drug seller. The detective identified defendant in the courtroom as the person who had sold him the steroids two-and-a-half years earlier on June 17 and the heroin on June 22. The State played the audiotapes from June 22 for the jury. The State also presented testimony from a lab chemist verifying the nature of the tested substances. The confidential informant did not testify.

Defendant did not testify in his own defense. However, he presented alibi testimony from his brother, his mother, and a friend. With some slight variations of the exact times, they each corroborated that, on the evening of June 22, defendant was at his mother's house during the time the State claimed he was on Clark Street dealing in the heroin.

As noted, the jury convicted defendant on all counts of the indictment. On appeal, defendant offers the following arguments for our consideration:

POINT I

WHERE DEFENDANT MAINTAINED THAT HE WAS "FALSELY IDENTIFIED" AND PRESENTED ALIBI WITNESSES, THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING THE STATE TO PROVE THAT THE DETECTIVE MADE AN OUT-OF-COURT IDENTIFICATION OF DEFENDANT'S PHOTOGRAPH, WITHOUT PRODUCING THE PHOTOGRAPH IN COURT, AND THEN GIVING AN IDENTIFICATION CHARGE THAT PROVIDED NO GUIDANCE ON HOW TO EVALUATE THE RELIABILITY OF THE OUT-OF-COURT IDENTIFICATION AND OMMITTED [SIC] RELEVANT "ESTIMATOR VARIABLES" CRITICAL TO DETERMINING THE RELIABILITY OF THE IN-COURT IDENTIFICATION.

POINT II

REVERSAL IS REQUIRED BECAUSE THE IMPROPER INTRODUCTION OF INADMISSIBLE AND HIGHLY PREJUDICIAL HEARSAY VIOLATED DEFENDANT'S RIGHT TO CONFRONTATION AND HAD THE CLEAR CAPACITY TO LEAD THE JURY TO A RESULT IT OTHERWISE WOULD NOT HAVE REACHED.

II.

A.

Defendant argues the trial court erred by allowing the detective to testify about his out-of-court identification without producing the photograph upon which identification was based. In addition, defendant argues the trial court erred by not giving the combined model "out-of-court and in-court"

identification charge, which includes additional factors for the jury to consider when assessing such identifications.

In approaching these related issues, we are guided by our Supreme Court's landmark opinion on eyewitness identification in State v. Henderson, 208 N.J. 208 (2011). In Henderson, the Court examined a variety of factors that, according to scientific studies, can confound what otherwise might appear to be an eyewitness's reliable identification of a criminal wrongdoer. Id. at 218.

These confounding factors noted in Henderson include so-called "system variables" (factors within the control of the criminal justice system, such as suggestive aspects of lineup and photo array procedures) and "estimator variables" (factors outside of the control of the criminal justice system, such as the distance between a victim and an assailant, poor lighting, stress, personal characteristics, and memory decay). Ibid. Given these variables, which can lead to the conviction of a misidentified innocent person, Henderson instructs that "courts must carefully consider identification evidence before it is admitted to weed out unreliable identifications, and . . . juries must receive thorough instructions tailored to the facts . . . to evaluate the identification evidence they hear." Id. at 302.

In order to address such reliability concerns, the Court in Henderson prospectively "revise[d] the State's framework for evaluating eyewitness

identification evidence." <u>Id.</u> at 287. Among other things, the Court elected to modify, <u>see id.</u> at 285-96, the applicable legal standard regarding eyewitness identification admissibility, formerly known as the "<u>Manson/Madison</u>" test. <u>See generally</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977) (reciting a two-part test of impressive suggestiveness and reliability); <u>see also</u> <u>State v. Madison</u>, 109 N.J. 223, 232-33 (1988) (adopting the federal approach in <u>Manson</u> to guide the courts of this State), <u>abrogated by</u> <u>Henderson</u>, 208 N.J. at 208.

In particular, the Court in <u>Henderson</u> discredited three of the <u>Manson/Madison</u> reliability factors (the opportunity to view the crime, the witness's degree of attention, and the witness's level of certainty at the time of the identification) because they are self-reporting elements that can be skewed by suggestive police procedures. <u>Henderson</u>, 208 N.J. at 286.

As directed by the Court in <u>Henderson</u>, <u>id.</u> at 219, special model jury instructions were adopted in 2012 to guide jurors on these critical concepts for both out-of-court and in-court identifications. <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Identification: In-Court and Out-of-Court Identifications" (2012); <u>Model Jury Charges (Criminal)</u>, "Identification: In-Court Identification Only" (2012); <u>Model Jury Charges (Criminal)</u>, "Out-of-Court Identification Only" (2012).

A-4894-17T4

These instructions, which became effective years before the instant trial, provide jurors with an enhanced explanation of the scientifically known factors that can result in a misidentification. As the Court stated in Henderson, "it is essential to educate jurors about factors that can lead to misidentifications." Id. at 303. The use of enhanced model jury charges on identification in criminal trials "is a critical step in the overall scheme." Ibid.

Here, the detective who obtained the drugs from the seller on the two occasions in question first ascertained the identity of the seller out of court. He then reaffirmed the identity of that seller as defendant in an in-court identification. The trial court provided the jurors with portions of only the model charge on in-court identifications, and did not give them the different "combined" model charge that includes guidance on out-of-court identifications. That latter model charge includes several components that are important to the detective's identification in this case.

First, with respect to "system variables," the omitted model charge addresses several facets that can affect whether the out-of-court identification was "the result of a suggestive procedure." Model Charges, "In-Court and Out-of-Court Identifications" at 6. Among other things, the charge asks jurors to consider whether the eyewitness who made the identification was exposed to "information or influence, that may have affected the independence of his/her

identification." Id. at 6-8. If, as here, the identification involved the viewing of a photograph, the jury would be advised of the qualitative differences between a single-photo identification procedure, as contrasted with one using a multi-photo array.

As the Court has more recently observed, a single-photo identification procedure is essentially a "show-up," which can be "inherently suggestive." State v. Pressley, 232 N.J. 587, 592 (2018); see also Model Charges, "In-Court and Out-of-Court Identifications" at 7 (describing a "showup" as "a procedure [that] is suggestive in nature"). In Pressley, the Court noted, for example, that it would have been preferable if the undercover officer who made a single-photo identification of the defendant in Manson after making a controlled purchase of drugs had instead been presented with a photo array containing a "reasonable number of persons" who looked like the suspect. 232 N.J. at 591 (quoting Manson, 432 U.S. at 117).

In this case, the jury could have reasonably found that the single-photo procedure used by the detective, based on defendant's driver's license, was inherently suggestive. Or at least the jury might have given less weight to the probative force of that identification, based on the sequence of events.

Before making the first drug transaction, the detective had already been supplied with hearsay information from the informant that the drug seller at the

location was known as "George." The testifying detective was also told by a Garfield detective that a person named "George Balloutine" lived at the Clark Street address. The detective also learned that the person in the single driver's license photograph he looked at was named "George Balloutine" and resided there. The detective had no other basis to believe the suspect he interacted with was defendant. Although the jury possibly may have considered this to be a reasonable and fair method to identify the seller, it likewise could have found -- after receiving proper instructions from the court -- that the process was too fraught with suggestive aspects to be reliable.

In addition, for reasons that are unclear from the record,[1] the trial court left out key portions of the charge on in-court identification explaining the pitfalls of disguises, changed appearances, and prior descriptions of a perpetrator. These unexplained omissions deprived the jurors of learning from the court, in an objective manner, about the "estimator variables" that could have affected the detective's out-of-court identification.

---

[1] Unfortunately, the charge conference that apparently took place in the afternoon on the next-to-last day of trial on January 18, 2018 was not transcribed. The transcribed discussion of the charge that took place the following day, January 19, does not reveal why the court and counsel omitted the combined model charge on identification, and why the sections of the in-court charge that concern disguises, changed appearances, and prior descriptions of a perpetrator were skipped over.

A-4894-17T4

Among other things, the charge would have explained to the jurors the perils of such elements as "disguises," "changed appearances," and "prior description[s] of the perpetrator."  In particular, the jury could have benefited from the following passages in the model instruction:

> The perpetrator's <u>use of a disguise</u> can affect a witness's ability both to remember and identify the perpetrator. <u>Disguises like hats</u>, sunglasses, or masks <u>can reduce the accuracy of an identification</u>.
>
> ***
> Another factor for your consideration is the accuracy of any description the witness gave after observing the incident and before identifying the perpetrator.  <u>Facts that may be relevant to this factor include whether the prior description matched the photo or person picked out</u> later, <u>whether the prior description provided details or was just general in nature</u>, and whether the witness's testimony at trial was consistent with, or different from, his/her prior description of the perpetrator.
>
> [Model Charges, "In Court and Out-of-Court Identifications" at 5 (emphasis added).]

These "estimator variables" were highly relevant in this case because, as defense counsel argued in summation, the fact that the seller was wearing a hat and the fact that the detective included in his police report a rather sparse description of the seller's clothing but no description of the seller's physical characteristics reasonably suggested the officer did not get a sufficient look at the seller to make a positive identification.  Without an instruction from the

judge that those factors were relevant and should be considered, the jury could have improperly concluded that defense counsel's argument had no merit or was not supported by legal or scientific authority.

We are mindful that defendant's trial attorney did not object to the omission of the combined model jury charge and these important considerations on the reliability of an out-of-court identification. To be sure, the court did read some, but not all, of the pertinent portions of the model charge on in-court identification. But that did not suffice, particularly given that in-court identifications can be influenced by tainted out-of-court identifications made by the same eyewitness.

It is well established that jury charges must provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." State v. Green, 86 N.J. 281, 287-88 (1981). Thus, "[t]he charge as a whole must be accurate." State v. Singleton, 211 N.J. 157, 182 (2012). This is because "[a]ppropriate and proper charges to a jury are essential for a fair trial." Green, 86 N.J. at 287.

More specifically, as is germane here, "[w]hen identification is a 'key issue,' the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge." State v. Sanchez-Medina, 231 N.J. 452, 466 (2018). A "missing instruction on identification is reviewed for plain

A-4894-17T4

error[,]" id. at 468, and is evaluated in light of "the strength and quality of the State's corroborative evidence rather than on whether defendant's misidentification argument is convincing." State v. Cotto, 182 N.J. 316, 326 (2005). Under the plain error standard, the error must be "clearly capable of producing an unjust result." R. 2:10-2.

We cannot fairly conclude that the absence of the combined model instruction on in-court and out-of-court identifications in this case and the omission of the portions on disguises, changed appearances, and prior descriptions was inconsequential. The case turned entirely on identification. Defendant (and, as to the second transaction, his alibi witnesses) contended he was not the drug seller and that he had been misidentified.

There were no third-party witnesses who saw the transactions. The State did not offer into evidence a screenshot or copy of the driver's license photo that the detective viewed in order to make his identification. We do not know how old that photo was, or how much it resembled defendant's appearance as of June 2015. Although it was not essential for the State to have moved that photograph into evidence, its absence further reduces the probative force of the State's identification testimony.

Lastly on this subject, we reject the State's assertion that any defect stemming from the omission of the model charge was cured by the arguments

made by defense counsel in summation discussing flaws in the identification processes. The words of a lawyer in summation are no substitute for the guidance provided from the mouth of a judge. See State v. Adams, 194 N.J. 186, 207 (2008). Moreover, the jurors were told, as is customary, that they were entitled to disbelieve the arguments and statements the lawyers made to them. Not so with respect to a judge's instructions, which we presume the jurors must and will obey.

Because the omission of this critical model jury charge in this case had a clear capacity to lead to an unjust result, R. 2:10-2, that plain error requires a new trial.

B.

Defendant separately argues the trial court deprived him of a fair trial, by allowing the detective to convey, through his testimony, various hearsay statements made by others. Because defendant's trial counsel did not raise such a hearsay objection, our review is guided by the plain error standard. State v. Branch, 182 N.J. 338, 353 (2005). We discern no such plain error and are unpersuaded any alleged hearsay violations were clearly capable of producing an unjust result.

Defendant argues the prosecution violated the restrictions of State v. Bankston, 63 N.J. 263 (1973), by eliciting testimony from the detective that

conveyed information he learned from other people. We disagree. The principles of Bankston permit a police officer to testify that he went to a crime scene or approached a suspect based "upon information received" in order for the State to show the officer had not acted in an arbitrary manner. Id. at 268. By contrast, the hearsay rule is violated when an officer becomes more specific by repeating what some other person told him, in a manner that suggests or implies to the jury that "he possesses superior knowledge, outside the record, that incriminates the defendant." Branch, 182 N.J. at 351.

The detective's testimony about what he had been told by the confidential informant did not go into details about the specifics of the alleged drug dealing that had been occurring in Garfield, nor the informant's basis of his knowledge. At most, the detective related that the informant had told him a person named "George" had been distributing drugs in the area. The disclosure was relevant to explaining how the police became involved in investigating the matter. The detective never stated or implied that the informant was asserting that this particular person was the drug seller. Even if the testimony were viewed as being offered for its truth, the limited disclosures were not manifestly prejudicial to amount to a denial of a fair trial or a material deprivation of the accused's right to confrontation. The testimony was not unfairly prejudicial under N.J.R.E. 403.

A-4894-17T4

Additionally, the detective's testimony about conversations between defendant and the informant that he overheard does not violate the hearsay rule, because defendant's own statements are admissible as assertions by a party-opponent. N.J.R.E. 803(b)(1). Likewise, out-of-court statements that the detective himself made when he was arranging the meetings with the drug dealer could appropriately be conveyed to the jury by the detective as part of his own narrative, as to which he had personal knowledge. See N.J.R.E. 602.

The detective's testimony that he learned from another person that a drug seller was at the Clark Street address does not require reversal, because the detective subsequently gained personal knowledge of drug dealing there by taking part in the two drug transfers at that location. Also, there was no hearsay violation stemming from the detective's testimony about calling the cell phone number to arrange the meetings with the seller, because the number itself is not an assertive statement, and the detective's conduct in calling the number is an action, not a statement. See N.J.R.E. 801(a) (defining a "statement" to encompass only actions that are intended to be assertive).

In any event, even if we were to regard portions of the detective's testimony to cross the hearsay boundaries, we are unconvinced those matters, which were not objected to by trial counsel, were so prejudicial as to require appellate relief. Had the jury been properly instructed on eyewitness

A-4894-17T4

identification principles, we are satisfied there is ample non-hearsay incriminating evidence in this record -- including the detective's first-hand account of the two drug transfers, the audio recordings, and the CDS itself -- to sustain defendant's conviction.[2]

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] If, hypothetically, a new trial was not required, the judgment of conviction must be amended to remove the duplicative fines and penalties, as noted in the State's brief.

A-4894-17T4