176 A.3d 788

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ALEXIS
SANCHEZ-MEDINA, DEFENDANT–APPELLANT.

A–10 September Term 2016
077883

Argued October 10, 2017—Decided January 18, 2018

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Elizabeth R. Rebein, Assistant Bergen County Prosecutor, argued the cause for respondent (Gurbir S. Grewal, Bergen County Prosecutor, attorney; Gurbir S. Grewal, of counsel and on the brief).

Ronald K. Chen argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Edward L. Barocas, Legal Director, and the Rutgers University School of Law-Newark Constitutional Rights Clinic, attorneys; Ronald K. Chen, Edward L. Barocas, Jeanne M. LoCicero and Alexander R. Shalom, of counsel and on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This criminal case involves charges of sexual assault. Defendant testified on his own behalf at trial and denied the allegations. At

the start of his cross-examination, the prosecution asked whether he had come to the United States legally. Over an objection, the jury learned that defendant had not. That highly charged evidence was irrelevant and should not have been admitted, as the State now concedes.

Only in a rare case will it be appropriate for a prosecutor to elicit testimony about a defendant's immigration status. In most instances, that type of evidence has no bearing on the crimes charged or a witness's credibility. It can also substantially prejudice the accused because of the inflammatory nature of the issue.

This appeal presents a second issue as well. Although the allegations related to different incidents that involved four separate victims, the case rested heavily on an identification by a single witness. No other victim could identify her assailant. Despite that, neither party requested a jury charge on eyewitness identification, and the trial court did not instruct the jury on the subject. In light of the overall strength of the proofs presented, that error was significant.

The cumulative effect of both errors denied defendant his right to a fair trial. We are therefore required to vacate defendant's convictions and remand for a new trial.

I.

A jury convicted defendant Alexis Sanchez-Medina of various sexual-assault crimes that involved four separate victims: R.D., D.J., A.M., and A.B. We refer to the victims by their initials to protect their identity. To recount the distinct criminal episodes, we rely on the victims' testimony at trial.

A.

On July 27, 2012, at around 8:30 p.m., R.D. was walking with her three-year-old son in Englewood. A man on a bicycle approached R.D. from behind, tried to push her, and grabbed her buttocks. He then rode up and down the street for several blocks,

threw kisses at her, and again tried to push her. He also made comments in Spanish that R.D. did not follow.

R.D. was headed to her boyfriend's house and, as she approached it, the man shoved her onto the lawn and kept moving on his bicycle. R.D. later noticed that a pink dress she had been carrying in a bag was missing. Days after, she saw the dress on a pole where she had last seen her assailant.

R.D. contacted the police almost three weeks later after she watched a news report "about a rapist" in the area. The next day, she met with detectives from the Englewood Police Department and gave a statement. She described her assailant as a Hispanic male with a ponytail. She said he wore a royal blue hat and t-shirt, short blue jeans, and sneakers at the time of the attack.

R.D. was the only witness to identify defendant. She selected his picture out of an array of six photographs. At first, she told a detective that she was 75 percent certain that the person in the photo had attacked her. Soon after, she said she was 100 percent sure. R.D. also identified defendant in court.

### B.

D.J. was inside her basement apartment in Englewood on August 9, 2012, at about 11:00 p.m., when she noticed the window air conditioner unit move. She went outside to investigate but did not see anyone. As D.J. walked back to her apartment and called a friend, someone lifted her from behind, "slammed [her] into the concrete," and pinned her down. The attacker reached down her pants and inside her underwear, touched her clitoris, and smelled his hand. The man then got up and ran away.

D.J. admitted that she did not get a good look at the attacker, who was behind her the whole time. She described him as a light-skinned African American or Hispanic male. She added that he had muscular arms, wore his curly black hair in a ponytail, and was dressed in dark clothing and white sneakers.

### C.

At about 10:00 p.m. on August 10, 2012, A.M. was walking to a convenience store in Dumont. She saw a "shadow of a guy" approach her from behind. The man grabbed both of her arms from behind and gripped them tightly. She tried to resist, and he eventually released her and ran away.

A.M. did not see her attacker's face. She said he appeared to be about 5'3" to 5'7" in height, had a medium build, and had short dark hair. She noted that he wore a sweatshirt and cargo pants.

### D.

About twenty minutes after the prior incident, A.B. was assaulted in Dumont. After she took out the garbage and placed it in a dumpster near her apartment, a man charged at A.B. from behind, forced her to the ground, and put his fingers up her shorts and inside her vagina. A.B. screamed and tried to push the attacker off of her, and he ran away.

A.B. never saw the man's face. As he ran, she saw the back of his head and his silhouette. She did not describe him other than to note that he wore dark shorts and a dark shirt.

### E.

As part of an investigation into the attacks, the police detained an individual on August 14, 2012, who partially fit the victims' descriptions. Officers questioned the suspect, defendant Sanchez-Medina, at the Dumont Police Department. The interrogation began at about 11:40 p.m. and lasted until close to 4:00 a.m.

At the outset, defendant disclosed that he was born in Honduras. After he waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he explained that he had been in the United States since 2008 and provided additional background information.

Defendant repeatedly denied any involvement in the attacks. He also made certain admissions. Because no one referred to the victims by name, some of defendant's comments cannot be readily matched to particular victims.

The early part of the interview appears to have focused on the incidents in Dumont. Defendant said that he might have hurt a woman when he knocked her to the ground while running. Because she screamed, he ran on. At another point, defendant said a woman "got caught on the bicycle" and tripped. After repeated denials, defendant admitted that he accidentally fell on a second woman when she tripped, and he grabbed her waist. Defendant did not admit touching the genitalia of either woman.

The interview later turned to the incidents in Englewood, and defendant consistently denied any involvement. After extended questioning, he admitted that he hit a woman with a bicycle while he was drunk. The woman was with a child. Defendant said that he wanted to touch her "butt" but instead passed her on the bicycle and grabbed only a shopping bag. He said the woman was carrying pants.

Defendant also admitted that he grabbed a woman by the stomach, from behind, while she was talking on a phone. Toward the end of the interview, a detective asked, "And when she was on the ground, you tried to put your hand on her vagina?" Defendant responded, "yes," and added that he put his hand on her to touch her and left when she screamed. He did not admit that he penetrated her.

None of defendant's statements appear to match A.M.'s account of her attack.

A Bergen County grand jury returned an indictment against defendant that charged him with three counts of second-degree attempted sexual assault, against R.D., D.J., and A.M., contrary to N.J.S.A. 2C:5–1 and 2C:14–2(c)(1) (counts one, three, and five); two counts of fourth-degree criminal sexual contact, against R.D. and D.J., contrary to N.J.S.A. 2C:14–3(b) (counts two and four);

and one count of second-degree sexual assault, against A.B., contrary to N.J.S.A. 2C:14–2(c)(1) (count six).

## F.

All four victims testified at trial and relayed the above details. Defendant testified as well. He denied that he had ever seen any of the victims or done anything to them. His defense was misidentification. Defendant also claimed he made false admissions to the police.

The prosecution began its cross-examination of defendant with this question: "You're from Honduras, right?" After defendant said "yes," the prosecution asked, "And you didn't come into the United States legally?"

Defense counsel objected, and the trial judge overruled the objection. Both the court and the prosecution mistakenly recalled that defendant had testified he had no prior involvement with the police and no record.[1] The court explained that defendant could not "have it both ways" and improperly allowed the line of inquiry to test defendant's credibility. Defendant then confirmed that he had not "come into this country legally."

The judge gave conflicting limiting instructions about that evidence. After defendant's testimony, the judge instructed the jury as follows:

> You heard testimony from the defendant and there was a reference to his illegal status. You're not to use that as proof of guilt[ ] concerning the offenses listed in the indictment. You can, however, use that information to test the credibility of the defendant as to whether or not he follows the rules of society and therefore it could make a difference concerning the issue of credibility, but not as proof of the underlying offenses.

Later in the day, after closing arguments, the trial judge gave final instructions to the jury and advised them on the issue again:

> [E]arlier I gave you an instruction as to [the] immigration status of the defendant. I want you to disregard the earlier instruction and completely focus on this particular limiting instruction, all right, limiting instruction slash charge.

---

[1] Our holding does not turn on this mistake.

You have heard evidence that the defendant is in this country illegally. You may not use the mere fact that the defendant may be illegally in the country to conclude that he is less likely to comply with our society's rules and therefore committed the crimes in the indictment.

The judge did not instruct the jury on how it might use the testimony in the record about defendant's immigration status.

In addition, although R.D.'s identification of defendant was central to the case, neither party asked the judge to instruct the jury on how to evaluate the evidence. The court did not instruct the jury specifically on that point on its own.

The jury found defendant not guilty of attempted sexual assault of R.D. (count one), but guilty of the lesser-included offense of simple assault. The jury reached the same verdict as to the attack against A.M. (count five). The jury found defendant guilty of criminal sexual contact with R.D. (count two), attempted sexual assault against D.J. (count three), criminal sexual contact with D.J. (count four), and sexual assault against A.B. (count six).

The court sentenced defendant to an aggregate term of imprisonment of 18.5 years, with 13.6 years of parole ineligibility.

## G.

In an unpublished opinion, the Appellate Division affirmed in part, reversed in part, and remanded for further proceedings. Defendant raised nine issues, only two of which are relevant at this time.

On appeal, the State acknowledged that the prosecution should not have elicited testimony about defendant's immigration status. The panel found that defendant was not prejudiced by the testimony in light of the trial court's limiting instructions.

The Appellate Division also found that the trial court should have charged the jury on identification. The panel, though, concluded that the omission did not constitute plain error in light of the strong evidence that corroborated R.D.'s identification, specifically, defendant's statement.

The panel vacated defendant's conviction on count three—attempted sexual assault against D.J.—because the jury instruction on attempt was erroneous.

We granted defendant's petition for certification limited to the following issues: the admissibility of defendant's immigration status for impeachment purposes; and the trial court's failure to instruct the jury on identification. 228 N.J. 57, 154 A.3d 688 (2016).

## II.

This appeal presents an unusual situation in that both parties now agree that it was error to question defendant about his immigration status and error not to give the jury an instruction on eyewitness identification. The parties and amicus have different views on the effect of those errors.

Defendant contends that evidence of his immigration status was not only inadmissible but also so prejudicial and inflammatory that it deprived him of his right to a fair trial. He contends that the cross-examination was improper under the rules of evidence and undermined his credibility before the jury. He also submits that the trial court's limiting instructions failed to cure the error.

Defendant adds that an identification charge was required because identification was the key issue in the case. He maintains the charge was also needed to enable the jury to evaluate the reliability of the single eyewitness victim. In defendant's view, because the State's case "rested on an unreliable identification and an incomplete and inconsistent statement" to the police, the failure to charge the jury on eyewitness identification constituted reversible error.

In the alternative, defendant argues that the cumulative effect of both errors warrants a new trial.

The State argues that, although defendant's immigration status should not have been admitted for impeachment purposes, defendant was not denied a fair trial. According to the State, the evidence against defendant was overwhelming, the prosecution did

not dwell on his immigration status, and the judge's limiting instructions cured the error.

The State also claims that the lack of an identification charge was not plain error. The State points to "strong corroborating evidence" linking defendant to the attacks and to defendant's statement. In addition, the State maintains that if the estimator variables outlined in State v. Henderson, 208 N.J. 208, 27 A.3d 872 (2011), apply to this case, they support the reliability of R.D.'s identification.

We granted the American Civil Liberties Union of New Jersey (ACLU) leave to appear as amicus curiae. The organization addresses the immigration issue and reinforces defendant's position. The ACLU stresses that evidence of a defendant's federal immigration status is rarely probative of a relevant substantive issue and can "arous[e] public passion and prejudice against undocumented immigrants." The ACLU also contends that the jury instruction in this case exacerbated the error. The group instead highlights a recent model jury charge on the topic.

### III.

The State rightly concedes that it was improper to question defendant about his immigration status. As a general rule, that type of evidence should not be presented to a jury.

To be admissible at trial, evidence must be relevant—that is, it must have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Whether a defendant entered the country legally tells a jury nothing about whether he committed an act of sexual assault. In this case, it is simply not relevant to the offenses for which defendant Sanchez-Medina was on trial.

Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403. Both today and in late 2013 when this trial took place, evidence of

a defendant's undocumented immigration status could appeal to prejudice, inflame certain jurors, and distract them from their proper role in the justice system: to evaluate relevant evidence fairly and objectively.

In limited circumstances, proof of a person's immigration status can be admissible. If the prosecution, for example, promised a witness favorable immigration treatment in exchange for truthful testimony, a jury would be entitled to assess the witness's credibility in light of that promise. Or if a defendant had lied about his immigration status to obtain government benefits as part of a scheme to defraud, his true status would be relevant to the crime charged. Still, exceptions like those are rare. In most cases, the immigration status of a witness or party is simply irrelevant, and a jury should not learn about it.

Before attempting to introduce this type of evidence, parties should raise the issue with the court outside of the jury's presence, under N.J.R.E. 104. If the evidence is admitted, the court should give an appropriate limiting instruction. See Model Jury Charges (Criminal), "Credibility—Immigration Consequences of Testimony" (rev. June 6, 2016).

Other federal and state courts have reached the same conclusion about the relevance of a witness's immigration status. See, e.g., Solis v. SCA Restaurant Corp., 938 F.Supp.2d 380, 401 n.11 (E.D.N.Y. 2013) (noting that "immigration status was irrelevant to issues in the case and not probative on the issue of the credibility of the witnesses"); Velasquez v. Centrome, Inc., 233 Cal.App.4th 1191, 183 Cal.Rptr.3d 150, 168 (2015) ("[I]mmigration status alone has no tendency in reason to prove or disprove any fact material to the issue of a party's credibility."); Ayala v. Lee, 215 Md.App. 457, 81 A.3d 584, 598 (2013) ("Immigration status alone does not reflect upon an individual's character and is thus not admissible for impeachment purposes."); see also Figeroa v. INS, 886 F.2d 76, 79 (4th Cir. 1989) ("An individual's status as an alien, legal or otherwise ... does not entitle the Board [of Immigration Appeals] to brand him a liar.").

Courts have also highlighted the prejudicial effect of the evidence. In Serrano v. Underground Utilities Corp., for example, the Appellate Division upheld a protective order that restricted discovery relating to the plaintiffs' immigration status. 407 N.J.Super. 253, 258, 970 A.2d 1054 (App. Div. 2009). As the panel observed, courts "must be cognizant of the risks of undue prejudice if [the parties'] illegal immigration status is disclosed to a jury at the time of trial.... Their illegal status in this country is very likely to trigger negative sentiments in the minds of some jurors." Id. at 274, 970 A.2d 1054.

Other jurisdictions agree. See, e.g., Andrade v. Walgreens-OptionCare, Inc., 784 F.Supp.2d 533, 535 (E.D. Pa. 2011) ("Many courts have opined that references to a party's immigration status expose that party to a substantial risk of unfair prejudice."); Escamilla v. Shiel Sexton Co., 73 N.E.3d 663, 675 (Ind. 2017) (recognizing that plaintiff's immigration status carries risk of unfair prejudice); TXI Transp. Co. v. Hughes, 306 S.W.3d 230, 244 (Tex. 2010) (finding that "prejudicial potential" of party's immigration status "substantially outweighed any probative value"); Salas v. Hi-Tech Erectors, 168 Wash.2d 664, 230 P.3d 583, 587 (2010) (finding low probative value of plaintiff's undocumented status, with regard to lost future earnings, "is substantially outweighed by the danger of unfair prejudice"); Gonzalez v. City of Franklin, 137 Wis.2d 109, 403 N.W.2d 747, 760 (1987) (noting "the obvious prejudicial effect" of party's undocumented status); see also Sandoval v. State, 264 Ga. 199, 442 S.E.2d 746, 747 (1994) (noting that "an appeal to ... prejudice is improper in a court of justice").

■ A defendant's immigration status is likewise not admissible under other rules of evidence. It is not proof of character or reputation that can be admitted under Rules 404 or 608.[2] Proof of status alone is also not evidence of a prior criminal conviction. See

---

[2] Subject to a few exceptions, Rule 404(a) bars the admission of character evidence to prove that a person "acted in conformity therewith on a particular occasion." Rule 608 is one of the exceptions to the rule. N.J.R.E. 404(a)(3).

N.J.R.E. 609. Nor is a person's immigration status admissible as a prior bad act under Rule 404(b). To be admissible, such evidence must be "relevant to a material issue," and its probative value "must not be outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992) (factors one and four of multi-factor test). Proof of a defendant's immigration status fails on both counts.

■ In this case, the error was significant. Although counsel did not dwell on defendant's undocumented status, the evidence was hard to miss. The prosecution's first questions on cross-examination focused on defendant's status and set the tone for what followed. To compound the error, the trial court issued conflicting instructions about whether jurors could consider the evidence to determine whether defendant "follows the rules of society." The final instruction correctly told the jury not to consider defendant's immigration status "to conclude that he is less likely to comply with our society's rules and therefore committed the crimes in the indictment." But the jury was not told that it could not rely on the evidence to assess defendant's credibility.

The better course would have been to strike the evidence altogether and tell the jury not to consider it at all. Instead, the evidence remained part of the trial record. Without a clear instruction to disregard the evidence entirely, we cannot be certain whether and how the jury might have relied upon it during deliberations.

## IV.

■ We turn now to the failure to instruct the jury on identification evidence, which the State appropriately recognizes was an

---

Rule 608(a) allows character evidence in the form of reputation or opinion testimony only as it relates to the witness's character for truthfulness or untruthfulness. Specific instances of conduct are generally not admissible to prove a character trait. N.J.R.E. 608(a). There are two exceptions to that rule: proof that a "witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged," N.J.R.E. 608(b); and proof of a criminal conviction, pursuant to N.J.R.E. 609. Neither exception applies here.

error. R.D.'s identification of defendant was central to this case. She was the sole witness to identify defendant, and his defense at trial was misidentification. When eyewitness identification is a "key issue," the trial court must instruct the jury how to assess the evidence—even if defendant does not request the charge. State v. Cotto, 182 N.J. 316, 325, 865 A.2d 660 (2005).

## A.

■ This Court has addressed the topic of eyewitness identification on a number of occasions in recent years. In 1999, in State v. Cromedy, the Court considered social science studies that revealed that identifications are less reliable when a witness and a perpetrator are of different races. 158 N.J. 112, 121, 727 A.2d 457 (1999). The Court concluded that jury instructions on the reliability of cross-racial identifications are required in certain cases. Id. at 132, 727 A.2d 457. Years later, in State v. Romero, the Court recognized that "[j]urors likely will believe eyewitness testimony 'when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all.'" 191 N.J. 59, 75, 922 A.2d 693 (2007) (quoting Watkins v. Sowders, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting)). Based on additional social science evidence, the Court ordered that juries be instructed on that point when appropriate. Ibid.

In 2011, the Court examined expert testimony and scientific studies about a number of variables that affect human memory. Henderson, 208 N.J. 208, 27 A.3d 872. Based on that body of evidence, the Court directed that new jury instructions be developed. Id. at 298–99, 27 A.3d 872. The following year, the Court approved new model jury charges on eyewitness identification, which addressed various factors like memory decay, stress, and the duration of the crime. Model Jury Charge (Criminal), "Identification: In-Court and Out-Of-Court Identifications" (rev. July 9, 2012). The charges went into effect on September 4, 2012—more than a year before the trial in this case began.

■ Even though the alleged assaults here took place before the effective date of the new model charge, the court should have used the revised charge at trial in 2013. In much the same way, new rules of evidence that do not lower the level of proof needed to convict a defendant generally apply at trial, even if they are adopted after the commission of a crime but before trial. See State v. Rose, 425 N.J.Super. 463, 468–70, 42 A.3d 172 (App. Div. 2012) (discussing Carmell v. Texas, 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000)).

The jury in this case should have been instructed about some of the factors discussed in Henderson. R.D. initially made an identification several weeks after the offense. At first, she said she was 75 percent certain; soon after, she stated that she was 100 percent sure. In her direct examination at trial, R.D. told the jury that she was "[a] hundred percent sure." At a charge conference, the parties and the court should have considered whether charges on memory decay, confidence, stress, duration, lighting, and other factors were warranted. Henderson, 208 N.J. at 261–62, 264, 267, 296–99, 27 A.3d 872.

The jury, however, did not hear any charge on identification. Neither the defendant nor the public are well-served when that happens in a case like this. To be sure, the judge should have given the charge on his own because R.D.'s identification was a "key issue." Cotto, 182 N.J. at 325, 865 A.2d 660. But counsel for the State and the defense are very much a part of the trial process as well. It is imperative that both sides carefully evaluate and propose relevant jury instructions before and during trial, rather than after a verdict. That practice helps protect defendants against unfair trials, avoids putting witnesses through the ordeal of testifying twice, and respects the jury's time.

The Judiciary has compiled model criminal jury charges that are available online. https://www.judiciary.state.nj.us/attorneys/criminalcharges.html. We invite the State and the Public Defender

to consider how best to use those resources in a systematic way in advance of trial.[3]

### B.

 The missing instruction on identification is reviewed for plain error. State v. Cole, 229 N.J. 430, 455, 163 A.3d 302 (2017); Cotto, 182 N.J. at 326, 865 A.2d 660. The error must be evaluated "in light of the overall strength of the State's case." State v. Galicia, 210 N.J. 364, 388, 45 A.3d 310 (2012) (quoting State v. Walker, 203 N.J. 73, 90, 999 A.2d 450 (2010) (internal quotation marks omitted)).

Defendant's convictions rest largely on the testimony of four victims, only one of whom could identify him. No forensic evidence linked defendant to the crimes charged, and no other witnesses observed or could corroborate any of the incidents.

The witnesses' descriptions of their assailants varied. Two described a man with a ponytail, one said he had short hair, and the fourth did not describe his features. Only two victims described the attacker's race: one said he was a Hispanic male, and the other described a light-skinned African American or Hispanic male. For the Dumont attacks, which were twenty minutes apart, the first victim said her assailant wore a sweatshirt and cargo pants, and the second described a dark shirt and dark shorts.

In addition, although the assaults shared some similarities, they differed from one another in key ways. R.D. testified that a man grabbed her buttocks from behind. D.J. and A.B. each explained how a man reached into her pants and touched her genitalia. And A.M. recounted how a man grabbed her arms tightly behind her. Only one incident involved a bicycle. The assaults were not

---

[3] The trial court ably instructed the jury that the State had the burden to prove each element of the offenses charged and that defendant was the actor who committed the crimes. As a result, we need not address at length defendant's argument, based on Cotto, 182 N.J. at 326, 865 A.2d 660, that that aspect of the charge was insufficient.

"signature" crimes that, on their own, suggest the same person carried out each attack. See Cofield, 127 N.J. at 336, 605 A.2d 230. One of the victims, in fact, did not describe a sexual assault.

Defendant's statement to the police, which he recanted at trial, offers some corroboration. Yet he also denied the core of the accusations during the interview. In addition, as the State conceded at oral argument, the statement contains no details about the assault on A.M. In fact, there was no evidence introduced at trial of an attempted sexual assault against A.M. The jury properly acquitted defendant on that charge.

Looking at all of the proofs together, the evidence against defendant was not overwhelming, as the State suggests.

## V.

Even if an individual error does not require reversal, the cumulative effect of a series of errors can cast doubt on a verdict and call for a new trial. State v. Jenewicz, 193 N.J. 440, 473, 940 A.2d 269 (2008). For that reason, we need not decide if either error in isolation warrants reversal.

Here, the jury received no guidance about how to assess the single identification of defendant—a critical issue at trial that defendant disputed. And the jurors were not told to ignore provocative evidence about defendant's immigration status. Together, those errors undermined defendant's right to a fair trial. They raise serious questions about whether the outcome was just, particularly in light of the strength of the evidence presented. See R. 2:10–2. We therefore have no choice other than to vacate defendant's convictions.

## VI.

For the reasons set forth above, we vacate defendant's convictions and remand the case to the Law Division for a new trial.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ–VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.