# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2307-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMAINE L. COLE,

     Defendant-Appellant.

_____

Argued May 10, 2021 – Decided June 22, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 17-04-0550.

Brian J. Yarzab, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Brian J. Yarzab, on the briefs).

Deepa S. Jacobs, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, of counsel; Catherine A. Foddai, Legal Assistant, on the briefs).

Appellant filed pro se supplemental briefs.

PER CURIAM

A jury found defendant Jamaine L. Cole guilty of six counts of a seven-count indictment alleging that he conspired with others to commit a burglary and robbery. After his trial, defendant was sentenced to an aggregate term of twenty-seven years in prison, with an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals from his conviction, arguing the following points:

POINT I

THE TRIAL COURT COMMITTED PLAIN ERROR IN CHARGING THE JURY ON DEFENDANT'S LIABILITY AS A CONSPIRATOR. THE CHARGE FAILED TO EXPRESSLY ACKNOWLEDGE THE STATE'S CONCESSION THAT THE WRONG APARTMENT WAS BURGLARIZED, AND UTTERLY FAILED TO POINT OUT TO THE JURY PORTIONS OF DEFENDANT'S STATEMENT EMPHASIZING THAT THE EVENTS THAT OCCURRED IN THE VICTIMS' APARTMENT WERE NEVER CONTEMPLATED BY DEFENDANT. THE COURT'S FAILURE TO EMPHASIZE THAT THE WRONG APARTMENT WAS BURGLARIZED OR TO EXPLAIN THE LAW OF CONSPIRACY IN THE CONTEXT OF THE FACTUAL RECORD, DEPRIVED DEFENDANT OF A FAIR TRIAL. (ISSUE NOT RAISED BELOW.)

POINT II

DEFENDANT'S REPEATED REQUEST TO SPEAK WITH HIS GIRLFRIEND BECAUSE HE "NEEDS SOME ADVICE" AND "I JUST DON'T UNDERSTAND," A REQUEST THAT BEGAN IMMEDIATELY FOLLOWING DEFENDANT'S SIGNING OF THE [MIRANDA[1]] WAIVER, COMBINED WITH THE INVESTIGATING DETECTIVE'S MISREPRESENTATION TO DEFENDANT THAT IF HE SPOKE WITH HER "SHE GETS CALLED TO BE A WITNESS" DEMONSTRATES THAT DEFENDANT'S ATTEMPT TO INVOKE HIS RIGHT TO SILENCE WAS OBSTRUCTED BY POLICE AND THAT HIS ATTEMPTED INVOCATION OF HIS RIGHT TO REMAIN SILENT WAS NOT SCRUPULOUSLY HONORED.

POINT III

THE TRIAL COURT'S REFUSAL TO ALLOW CROSS-EXAMINATION OF THE MALE VICTIM ABOUT HIS DELIBERATE MISTRANSLATION OF HIS WIFE'S TESTIMONY DESCRIBING ONE INTRUDER AND REFUSAL TO ALLOW CROSS-EXAMINATION OF BOTH ADULT VICTIMS ON WHETHER THEIR TESTIMONY WAS INFLUENCED BY THE BERGEN COUNTY PROSECUTOR'S OFFICE'S SUBMISSION OF AN INDISPENSABLE CERTIFICATION SUPPORTING THEIR U VISA APPLICATION CONSTITUTED REVERSIBLE ERROR.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2307-18

POINT IV[2]

SINCE THE PROCEDURES FOR APPLYING FOR A TELEPHONIC ARREST WARRANT WERE NOT COMPLIED WITH, AND DID NOT SATISFY THE PROBABLE CAUSE STANDARD, THE "TOTALITY OF THE CIRCUMSTANCES" REQUIRES THE INVALIDATION OF THE ARREST WARRANT AND [DEFENDANT'S] CUSTODIAL STATEMENT BE SUPPRESSED.

We are unpersuaded by defendant's arguments and affirm his conviction.

I.

The relevant facts leading to defendant's arrest and conviction as developed at trial are summarized as follows. On the night of December 11, 2016 into the early morning hours of December 12, 2016, the victims, Eric,[3] the husband, Mary, the wife, and Kyle, their five-year-old son, were asleep in their apartment in Mary and Eric's room.

During the night of the incident, Mary woke up after hearing a loud noise. She could not tell where the noise was coming from, so she went to the kitchen but did not see anything and went back to their bedroom. A minute or two later,

---

[2] We have renumbered defendant's pro se argument to avoid confusion.

[3] Because defendant was convicted of endangering the welfare of a child, we use a fictitious name to refer to the child. N.J.S.A. 2A:82-46. To adequately protect his identity, we also use pseudonyms to refer to his parents. R. 1:38-3(b)(9).

A-2307-18

she heard another noise, this one much louder than the first, making her believe something had broken. This time, she got scared and woke her husband up. Eric got up and walked to the kitchen and she followed behind him. Once outside their bedroom, Mary "saw that a man was getting up with a mask and a pistol." She was unable to see his face because he had a mask on but saw that he had a gun aiming at them. She ran back to their bedroom and hid under the covers with Kyle tucked to her chest.

Eric remained in the kitchen. The man, who was taller than Eric and wearing a red hooded sweatshirt and ski mask, asked Eric several times where the money and the weed were. He was carrying a black handgun, of the type that "police have." Eric began to retreat into the hallway, where the person pushed him into the bathroom and began to kick Eric and hit him with the gun. Eric did not see another person, but he heard other voices, asking where the money and the weed were. Eric believed this went on for about three or four minutes.

While hiding in the bedroom, Mary heard noises in the hallway, but she could not understand what the voices were saying because she did not speak English fluently. While she was in bed holding Kyle, a man came into the room with a gun aimed out in front of him, when he entered, Mary made a "noise"

5

because she was scared, and the man turned to her and Kyle and aimed the gun at them. The man went towards Kyle's bedroom, which was connected to his parents' room, and was saying something in English. She could tell from his tone of voice that he was "asking where something was," and that "he wanted something."

The man went through the computer desk drawers, Mary's dresser drawers, and after finding nothing but paper and clothing, threw the objects that were on top of her dresser onto the floor. She could not see his face because he was wearing a mask and only saw that he was wearing a black sweatshirt with a hood. Another person stood in the doorway and the two intruders began talking, but Mary did not know what they said.

After the intruders left, Eric went upstairs to the portion of the house where the owner lived and told him what had just occurred. The homeowner's wife then called the police. Detective David Esposito of the Lodi Police Department responded to the scene. Upon his arrival, he noticed two home security cameras mounted on the house. Esposito spoke with the homeowner and the homeowner's son and reviewed the footage from the videos with help

6

from the son.[4] From the surveillance footage, neither Esposito, the homeowner, nor the homeowner's son could identify any of the four individuals depicted.

Detective Joseph Savino with the Bergen County Sheriff's Office also responded to the scene. According to Savino, the points of entry into the home appeared to be a pushed in air conditioner unit and the entrance door to the basement apartment. During his investigation, he recovered a partial handprint from the air conditioning unit. At trial, the parties stipulated to the fact that the palm print from the air conditioning unit matched defendant's palm print, which the police already had on file.

Meanwhile, Esposito spoke with the victims at the police headquarters. Because Mary could not speak English well, Eric interpreted her account of the event for Esposito. After obtaining the victims' statements, Esposito applied for an arrest warrant. In the affidavit of probable cause, Esposito wrote that defendant entered the victims' home by pushing in an air conditioner and then pushing the victim to the ground, pointed a firearm at him, and attempted to strike the victim in the head. Esposito also wrote that defendant asked where the weed and money were, and that a firearm was also pointed at the victim's

---

[4] We note that, as adduced at the trial, the homeowner's son was a suspected drug dealer and believed to be the actual target of the robbery.

A-2307-18

wife and five-year-old child. Based on this information, a Municipal Court Judge signed the arrest warrant for defendant and the police arrested him ten days later.

On the day of defendant's arrest, Detective Frank Gallucci with the Bergen County Prosecutor's Office interviewed defendant. During the interrogation, defendant admitted to being at the scene, but denied going into the house and said he only saw one person go inside but did not know the name of that person. He stated many times that he did not condone aiming a gun at a child and he also explained that he was not involved beyond pushing in the air conditioning unit.

A grand jury later returned an indictment charging defendant with two counts of first-degree robbery, N.J.S.A. 2C:15-1; and one count of the following: second-degree conspiracy to commit armed burglary and/or armed robbery, N.J.S.A. 2C:5-2; second-degree burglary, N.J.S.A. 2C:18-2; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(a); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2).

Before his trial, defendant filed a motion to suppress his custodial statement, which was denied after a hearing. His motion for reconsideration was also denied.

During trial, Gallucci testified regarding the investigation and his interrogation of defendant. The State also played defendant's statement for the jury. Gallucci confirmed that he believed the target of the robbery was a suspected drug dealer, related to the homeowner. He also testified that he identified defendant as one of the individuals on the surveillance footage after reviewing it.

After the State rested, defendant made a Reyes[5] motion, which was denied. The jury convicted defendant of all counts except count six, unlawful possession of a weapon. Thereafter, the judge sentenced defendant and entered his judgment of conviction. This appeal followed.

II.

We begin our review by addressing defendant's challenge, raised for the first time on appeal, to the conspiracy instruction given by the trial court. Defendant argues this instruction constituted plain error because the court did not adequately explain the issue of foreseeability, did not emphasize that the

---

[5] State v. Reyes, 50 N.J. 454, 458-59 (1967).

wrong apartment was burglarized, and did not remind the jury of defendant's statement, specifically that he never entered the house and would not have allowed anyone to point a gun at a child.

In instructing the jury on conspiracy liability, without any objection by defendant, the trial court explained that "a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable or both."  It further explained that a person is legally accountable for the actions of another "when he is engaged in a conspiracy with such other person and the conduct is within the scope of the conspiracy or a reasonably foreseeable . . . consequence of the conspiracy."  The act cannot be "too far removed or too remote" from the objectives of the original conspiracy.

The court further explained:

> [Y]ou must decide whether defendant engaged in a conspiracy with others to commit the crimes of armed robbery or burglary.  You must . . . also consider whether the robbery of [Eric, Mary, and Kyle], and the endangering of [Kyle] were objectively foreseeable and reasonably anticipated results of the original conspiracy or whether the commission of these offenses is beyond the scope of the conspiracy.
>
> A reasonably foreseeable consequence means one which under all the circumstances presented a reasonable person would foresee.  The law does not require that . . . defendant actually recognized or subjectively believed that the robbery of [Eric, Mary,

A-2307-18

> and Kyle] and the abuse of [Kyle] were foreseeable consequences of the conspiracy to commit armed robbery or burglary.
>
> The test is an objective one. That is whether under the circumstances a reasonable person would foresee the robberies and endangering as real potential consequences of the conspiracy to commit armed robbery and armed burglary.
>
> [(Emphasis added).]

Because defendant raised his challenge to the jury instruction for the first time on appeal, we review his argument for plain error. R. 2:10-2. "Plain error refers to any error 'clearly capable of producing an unjust result.'" State v. Montalvo, 229 N.J. 300, 320-21 (2017) (quoting R. 2:10-2). When there is no objection at the time a jury instruction is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

To succeed in those circumstances, a defendant must establish: (1) "legal impropriety in the charge prejudicially affecting [his or her] substantial rights" and (2) an error "sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)); see also Montalvo, 229 N.J. at

11

321. Any alleged plain error "must be evaluated 'in light of the overall strength of the State's case.'"  State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

When instructing the jury, "[t]he trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'"  State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).  "Thus, the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'"  Ibid. (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)).

Applying these guiding principles, we are unpersuaded by defendant's arguments.  Here, there is no legal impropriety in the instructions, as the trial court specifically explained that to be guilty of conspiracy, defendant did not need to actually contemplate the endangering of Kyle or the robbery of the victims at the time he agreed with the others to commit a robbery and burglary. The trial court properly explained that the question of foreseeability was an objective question, thus, it was not necessary for the court to emphasize that

A-2307-18

defendant stated that he did not condone pointing a gun at a child or that he never entered the apartment.

Defendant urges that the jury should have been reminded of these facts and that the wrong apartment was burglarized, but they are irrelevant to the objectivity standard underlying foreseeability. The question the jury had to answer was not whether defendant specifically contemplated these outcomes, but whether those actions were reasonably foreseeable at the time defendant and others entered into the decision to burglarize the home. See State v. Bridges, 133 N.J. 447, 466-67 (1993) (explaining a co-conspirator may be liable for not only acts within the scope of the conspiracy, but also for any criminal acts that were "reasonably foreseeable as the necessary or natural consequences of the conspiracy"). We ascertain no error in the trial court's explanation of co-conspirator liability.

III.

Next, we consider defendant's challenge to the denial of his motion to suppress his custodial statement to police. Defendant argues that his request to speak to his girlfriend at the beginning of the interview constituted an invocation of his right to remain silent and as such, the statement should have been suppressed. We disagree.

13

A.

At the pretrial suppression hearing, the State presented Gallucci, who explained his experience with gang investigations. He understood that whenever "a co-defendant or a suspect or somebody who associates themselves with a gang even speaks to a police officer or a cop, it's considered a major violation." Gallucci believed there was a "general reluctance" for people in those positions to speak with law enforcement.

Prior to his interview of defendant, he had information that defendant was an "associate or member" of the Bloods gang, and he had "every reason to believe that [defendant] had knowledge of gang activity taking place in Englewood."[6] On the day defendant was arrested, Gallucci went to the interrogation room and began speaking with defendant, but did not turn on the audio recording because he wanted to first see if defendant would cooperate with law enforcement regarding the gang violence. This non-audio recorded conversation lasted about twenty-seven minutes.

---

[6] Gallucci explained that there were approximately thirty shootings in the eighteen months prior to defendant's arrest. He also explained that this was an "extreme amount" for "any Bergen County municipality." These shootings were all open investigations at the time defendant was interviewed.

A-2307-18

The State played a portion of the recording of defendant's interview, including the non-audio portion. At the beginning of the audio-recorded portion, Gallucci told defendant, "Now . . . obviously you're not in Lodi by coincidence. This is stemming from an investigation –" and defendant interrupted, asking "Can I read the rights (inaudible)?" Gallucci informed him that he was at the police department regarding a home invasion, but before they talked about the case, he had to advise defendant of his rights. Gallucci then read defendant his rights and he confirmed his understanding of each right. Defendant also confirmed that no one was forcing him to speak with the officers and that defendant was not under the influence of drugs or alcohol. Defendant read his rights to himself and read them aloud per Gallucci's request. After he read his rights, defendant asked Gallucci if he could "call [his] girl too, [because he] just need[ed] some advice." In response, the following exchange occurred:

> [DETECTIVE GALLUCCI]: You need advice from your girl?
>
> [DEFENDANT]: Yeah, I want you to explain basically how you explained it to me, I want you to explain (inaudible) and see what she said.
>
> [DETECTIVE GALLUCCI]: Oh, explain your rights?

15

[DEFENDANT]: No, not my rights. My (inaudible) told me what was going down and what you need from me and everything.

Gallucci also asked if defendant's girlfriend was his attorney, and defendant responded that she was not. Gallucci also told defendant that the "only issue" he had with calling defendant's girlfriend was that the call would be "on the recording and then . . . later down the road, she gets called to be a witness." Defendant did not call his girlfriend before speaking with the police.

During the interrogation, defendant admitted to being on the scene, but denied going into the home and explained that he did not condone pointing a gun at a child. The police told defendant they recovered his palm print from the air conditioner and showed him a photo taken from the surveillance video. When he was shown the photo, defendant stated that the person depicted in the picture looked a lot like him. After admitting he was on the scene, he said that he only saw one person enter the house, and he did not know the name of that person. He eventually provided the name "Chucky" during the interview and provided initials of names but did not reveal the names of the other individuals that were there that night.

The State only played a portion of the interview during the hearing, Gallucci read an additional excerpt of the transcript for the record. In the

16

excerpt, defendant stated "if I didn't want to talk, I know my rights . . . if I didn't want to talk to you, I could have just said I need a lawyer. You understand what I'm saying? And we going to take—we'll take care of this—we'll take care of this to court."

The State argued that asking to speak to his girlfriend was not an invocation of his right to remain silent, but instead that he wanted the detectives to explain the proposed cooperation to his girlfriend. Defense counsel argued there were two issues—first the non-audio recorded portion of the interview where defendant had not been read his Miranda rights, and second, the invocation of his right to remain silent by asking to speak with his girlfriend.

On March 12, 2018, the trial court entered an order denying defendant's motion to suppress his statement and set forth its reasons in a written decision. The court concluded that defendant's request to speak with his girlfriend was not an invocation of his right to remain silent. While the court recognized defendant wanted advice, it highlighted that the "advice" he was seeking was not about his rights, but about the cooperation discussion defendant had just had with the detectives. The court found that "it could not have [been] reasonably inferred from defendant's innocuous statement that he desired to remain silent."

A-2307-18

Therefore, the State had proven defendant waived his rights beyond a reasonable doubt and the statement did not need to be suppressed.

Subsequently, the trial court also denied defendant's motion for reconsideration. In that motion, defendant argued that the court had failed to consider certain omitted portions of his statement. In denying the motion, the trial court explained that it had considered the entire recording, even the parts that were not specifically detailed in its prior opinion, and concluded that taking defendant's statements "in context, [the court] remain[ed] satisfied the sole purpose for defendant to speak to his girlfriend was to discuss the proposed cooperation agreement in which he would provide gang-related information to law enforcement."

B.

We "generally will defer to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019). Deference to a trial court's factual findings is appropriate "because the trial court has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). However, we review de novo the trial court's

legal conclusions that flow from established facts.  State v. Hamlett, 449 N.J. Super. 159, 169 (App. Div. 2017) (citing State v. Hubbard, 222 N.J. 249, 263 (2015)).

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and [New Jersey's] common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381-82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "New Jersey law requires that the prosecution 'prove beyond a reasonable doubt that the suspect's waiver [of that right] was knowing, intelligent, and voluntary in light of all the circumstances.'"  State v. A.M., 237 N.J. 384, 397 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

New Jersey law requires that "a request, 'however ambiguous,' to terminate questioning . . . must be diligently honored."  S.S., 229 N.J. at 382 (alteration in original) (quoting State v. Bey, 112 N.J. 123, 142 (1988)).  When a suspect's statement is "susceptible to two different meanings, the interrogating officer must cease questioning and 'inquire of the suspect as to the correct interpretation.'"  Id. at 382-83 (quoting State v. Johnson, 120 N.J. 263, 283 (1990)).  "Unless the suspect makes clear that he is not invoking his right to remain silent, questioning may not resume."  Ibid.

A-2307-18

Under some circumstances, a suspect's request to speak with a third party may constitute an invocation of the suspect's right to remain silent. See State v. Maltese, 222 N.J. 525, 545 (2015) (citing State v. Harvey, 121 N.J. 407, 581 (1990)). In Maltese, the twenty-year-old defendant agreed to take a polygraph test and afterwards, repeatedly asked to speak with his uncle before continuing to speak to the police. Id. at 533-38. The Court found that "[t]he facts presented here clearly indicate that defendant invoked his right to remain silent." Id. at 546. In that case, the defendant had "repeatedly stated that he wanted to speak with his uncle, whom he considered 'better than a freaking attorney,' before answering any further questions." Ibid. The Court also found that "defendant . . . unequivocally asserted more than ten times that he wanted to speak to his uncle before answering any further questions" and "defendant specifically stated that he wanted to consult with his uncle about 'what to do.'" Ibid. Moreover, once he asserted his right to remain silent, the police used the uncle to continue their investigation and therefore, his Miranda rights "were not scrupulously honored." Ibid.

This case is unlike Maltese, where the defendant had already taken a polygraph test and wanted advice from his uncle regarding his own culpability. Here, based upon its review of the interview, the trial court concluded that

20

defendant, who was thirty-two years old, wanted to get advice from his girlfriend about the proposed cooperation agreement that defendant had discussed with police. The record supports this conclusion.

After defendant asked to speak with his girlfriend, the detectives attempted to clarify his request and he specifically said that he did not want to talk about his rights with her. He also explained that she was not his attorney. Instead, he told them that he wanted the police to explain to her what the police would need from him. The trial court found, and we agree, that it was reasonable to believe he was referring to the possible cooperation he had just discussed for almost thirty minutes with the detectives. Moreover, contrary to defendant's assertion that Gallucci improperly "discouraged" defendant from invoking his rights by telling him the girlfriend would be called as a witness, there was no indication that defendant was invoking his right to remain silent and Gallucci could not have reasonably inferred that defendant was attempting to invoke any right when making that comment.

No part of defendant's conversation with the detectives about his girlfriend indicated he did not want to speak with the detectives, but instead that he wanted them to explain the situation to her. That defendant may have changed his mind about speaking to the police after consulting with his girlfriend about

21

cooperation does not make this an invocation of the right to remain silent. For that reason, the trial court properly denied defendant's motion.

IV.

Next, we consider defendant's contentions that the trial court's decisions limiting cross-examination deprived defendant of a fair trial. First, he argues that the trial court erred by not allowing defense counsel to question Eric on his interpretation of his wife's statement to the police. Second, he argues it was error for the trial court to forbid defense counsel from questioning the victims on their immigration status. We reject both arguments.

A.

During cross-examination of Eric, defense counsel attempted to question him on his interpretation of Mary's statements to the police. He asked if Eric had interpreted truthfully, and Eric confirmed he had. The trial court refused to allow the testimony to continue beyond that, explaining that defense counsel had to ask Mary what she said, not Eric. The judge explained that the translation would not be coming into evidence, so "whether he translated accurately, inaccurately, truthfully, [or] not, I'm not allowing it" because defense counsel had to ask Mary directly. When defense counsel explained that he wanted to ask Eric whether or not he "misrepresented" Mary's statement to Esposito, the

trial court asked Eric "did you deliberately lie to . . . the detective?" Eric answered no and when defense counsel requested a sidebar, the court denied it because the testimony was hearsay.

After Eric's testimony concluded and outside the presence of the jury, defense counsel attempted to explain to the court his line of questioning and claimed that Eric "blatantly lied" to the officer about what Mary said. Defense counsel wanted to bring out the fact that Mary said the person who entered the bedroom was wearing a white sweatshirt and that Eric told Esposito that the person was wearing a black sweatshirt.

The trial court explained that assuming that was true, his translation could not come into evidence because it was hearsay, and that only what Mary actually said would be coming into evidence. It explained "[w]hatever [Eric] translated is not evidence, is not coming into evidence, and is not going to be used, period." The court also noted that Eric had just had a gun in his face at the time and that he was not a certified translator.

During her cross-examination, Mary maintained that the color of the sweatshirt was black, and defense counsel confronted her with her prior statement. When asked again if she had ever said the sweatshirt was white, Mary answered, "I remember that it was black. I don't know, at that time I was

23

just so very fearful because of what had happened." She added that maybe she had said it was white, but she did not have everything clear then because she was nervous.

Esposito also testified and explained that he spoke with the victims at headquarters. In Esposito's report, he wrote that the "clothing [worn by the assailants] was described as red and black sweatshirts." He explained that no one had described a white sweatshirt to him during his investigation.

Defense counsel then attempted to recall Eric, but the trial court denied the application, finding that the issue of whether Eric properly translated the color of the sweatshirt was not relevant and was "nothing to attack anybody's credibility."

We review a trial court's decision to admit or exclude evidence under the abuse of discretion standard. State v. Garcia, 245 N.J. 412, 430 (2021). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" State v. Singh, 245 N.J. 1, 13 (2021) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Although a trial court retains broad discretion in determining the admissibility of evidence, that discretion is abused when relevant evidence offered by the defense and

24

necessary for a fair trial is kept from the jury." State v. Cope, 224 N.J. 530, 554-55 (2016).

"[T]he Sixth Amendment right of confrontation 'expresses a preference for the in-court testimony of a witness, whose veracity can be tested by the rigors of cross-examination.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Basil, 202 N.J. 570, 591 (2010)). Nonetheless, "[t]here are potential limitations on the right to confrontation, which 'may, in appropriate circumstances, bow to competing interests.'" State v. Jackson, 243 N.J. 52, 65-66 (2020) (quoting State v. Budis, 125 N.J. 519, 531 (1991)). Notably, "[a] trial court may 'impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Id. at 66 (emphasis added) (quoting Del. v. Van Arsdall, 475 U.S. 673, 679 (1986)); see also State v. Bass, 224 N.J. 285, 303 (2016).

In light of these principles and our review of the record, we discern no abuse of discretion in the trial court's decision. We cannot say there was any manifest denial of justice here, where the jury knew of the discrepancy in the color of the sweatshirt through cross-examination of Mary and the issue about the color of the sweatshirt was not relevant because neither Mary nor Eric

identified or otherwise implicated defendant. Evidence of his role in the burglary was the palmprint on the air conditioner, his statement to police and the contents of the video footage.

B.

At the Rule 104 hearing about the admissibility of the victims' immigration status and the State's involvement in their U visa applications,[7] Mary testified that she was born in Mexico and was not a United States citizen, nor was she a citizen on December 12, 2016. For the purposes of that hearing, the parties agreed that Mary was the victim of a crime on December 12, 2016. That crime was reported to the police and she gave a statement to the police on the same day the crime occurred. She explained that she told the police about what happened to get help from them. Mary was also aware that after December 12, 2016, a visa application was filed on her behalf, but she did not know the

---

[7] A U visa grants a non-citizen temporary immigration status and the possibility of lawful permanent resident status. U.S. Dep't of Homeland Sec., U Visa Immigration Relief for Victims of Certain Crimes (2017), https://www.dhs.gov/sites/default/files/publications/U-Visa-Immigration-Relief-for-Victims-of-Certain-Crimes.pdf. To qualify, a non-citizen must submit a form that includes the certification of a law enforcement official, who must detail the crime and the assistance the non-citizen provided in the prosecution of that crime. Ibid. The form does not "by itself grant any immigration benefit." Ibid.

specific type of visa application. She testified that no one from the prosecutor's office made her any promises about her visa application.

On cross-examination, Mary stated that she learned that the visa was being filed about "half a year" after she gave her statement to the police. Through acquaintances, she learned that she could apply for that visa. After she filled out the application, her immigration attorney explained that she needed a signature from the Bergen County Prosecutor's Office and that was how the office got involved with the immigration application.

Eric testified he was born in Mexico and at the time of the hearing he was not a citizen of the United States. He explained that about five to seven minutes after the crime occurred, the police were called and, on the same night, he gave a statement to the police. Since that night, his immigration lawyer filed a U visa application on his behalf. He stated that no one from the prosecutor's office made any promises to him about his application and at the time of the hearing, the outcome of his application was uncertain.

On cross-examination, Eric explained that he told his immigration lawyer about the incident, and his lawyer explained the U visa application to him and explained that an eligibility requirement for the U visa was that the applicant needed to be a victim of a crime. That was the only requirement his attorney

A-2307-18

explained. He did not know that cooperating with law enforcement was also a requirement for the application.

In an oral decision, the trial court denied defendant's motion to allow the victims' immigration status to be raised at trial. The court first explained that under Sanchez-Medina, immigration status is "not admissible in general for impeachment purposes." He also noted the "subtle distinction" that the issue in this case was the immigration status of the witnesses, not defendant's immigration status, and that the witnesses' immigration status "may or may not affect an outcome." The court found that the victims' immigration statuses were inadmissible under Rule 404, and that it was insufficient under Rule 608 for "proof of character or reputation." Ultimately, in weighing Rule 403, he concluded that the probative value, which was minimal, was "substantially outweighed by the prejudice and the negative inference that it will bring upon a jury."

The trial court also did not find that these circumstances impeached Eric's or Mary's credibility. First, the victims had independent counsel and the State did not represent them in their U visa application. Second, the court concluded that the prosecutor "signing off o[n] . . . the form that the victims . . . were helpful . . . or will be helpful is not tantamount to a promise of favorable

A-2307-18

immigration treatment in exchange for truthful testimony, notwithstanding that without that certification they could not make the application." The court did not agree with defendant that the prosecutor signing off on the form was a promised benefit. Finally, it explained that the probative value of the evidence would be minimal because the witnesses were not going to identify defendant. In the court's view, the probative value would be greater if the witnesses were going to go on the stand and specifically point out defendant.

Based on this record, we do not find that the trial court abused its discretion by barring any testimony about the victims' immigration status. At the outset, we acknowledge that both the United States and New Jersey Constitutions guarantee a defendant in a criminal matter the right to confront adverse witnesses. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; State v. Guenther, 181 N.J. 129, 147 (2004). However, that right is still subject to "N.J.R.E. 403[, which] provides for the exclusion of evidence that is otherwise admissible 'if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.'" State v. Trinidad, 241 N.J. 425, 449 (2020) (quoting N.J.R.E. 403).

In Sanchez-Medina, the Court considered the prejudicial effect of evidence concerning a person's immigration status, explaining that, "[a]s a general rule, that type of evidence should not be presented to a jury." 231 N.J. at 462. The Court found that "[i]n most cases, the immigration status of a witness or party is simply irrelevant, and a jury should not learn about it," id. at 463, because disclosure of a person's "illegal status in this country is very likely to trigger negative sentiments in the minds of some jurors." Id. at 464 (quoting Serrano v. Underground Utils. Corp., 407 N.J. Super. 253, 274 (App. Div. 2009)). However, and relevant here, the Court also explained that evidence concerning a witness's or party's immigration status may be admissible in "limited" and "rare" circumstances, such as where a witness is "promised . . . favorable immigration treatment in exchange for truthful testimony." Id. at 463.

We do not find that the circumstances presented here fall into the "rare" circumstances contemplated by the Court in Sanchez-Medina. The victims here sought out help from the police and began cooperating immediately and gave their statements to police the night of the home invasion. They were not promised favorable treatment in exchange for their cooperation, they cooperated from the very beginning. Moreover, the victims never directly discussed the immigration applications with the prosecutor's office. Although Eric mentioned

30

the incident to his immigration lawyer and that lawyer contacted the prosecutor regarding the U visas, there was no direct agreement between the prosecutor's office and the victims. We also note again that the victims did not place defendant at the scene of the crime and never implicated defendant at all, making their credibility less of an issue than if they had identified defendant as a participant in the crime.

V.

Finally, in defendant's pro se brief, he contends that the warrant issued for his arrest was invalid because the municipal court judge did not comply with procedural rules and because there was no probable cause for the issuance of the warrant. By extension, he argues that because his arrest warrant was invalid, his custodial statement to police should have been suppressed. We disagree.

A.

At a pre-trial hearing on defendant's motion to invalidate the arrest warrant, the municipal court judge that issued the warrant was called as the sole witness. The judge remembered receiving a phone call that someone had pushed in an air conditioner during a home invasion and that the police had a palm print and "basically they entered the apartment and there was a gun involved" and someone got hit. The State asked whether he had an opportunity to review the

31

complaint warrant before his testimony that day, and the judge confirmed he had, but stated "[t]o tell you the truth, I took a copy, but I never looked at it, if you want to know the truth of the matter. I'm not going to lie to you." He also explained that he found probable cause at the time of the call and that he was still satisfied that there was probable cause to justify the warrant. On cross-examination, the municipal judge explained that he did not recall whether he reviewed the complaint within forty-eight hours after issuing it on December 30, 2016.

On October 5, 2018, the trial court denied defendant's motion in an oral decision on the record. The court began by noting that this arrest warrant was issued on or about December 30, 2016, and on January 1, 2017, the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, went into effect and in part, changed some procedural rules surrounding arrest warrants. He also explained that the complaint itself was drawn at 5:50 p.m. on December 29, 2016, and on December 30, 2016, the municipal court judge affixed his electronic signature finding probable cause.

As to defendant's motion, the trial court found the municipal court judge to be "very credible" but presumed "for the purposes" of defendant's motion that the judge did not comply with the procedural rule fully, observing that there

32

A-2307-18

were no notes taken or any recording of the phone call, and that from the judge's testimony, the municipal court judge did not have the warrant delivered to him. The trial court also noted that as the municipal judge testified, he had not reviewed the warrant until the hearing. Nevertheless, the trial court concluded that the crux of the issue was the constitutional question—whether there was probable cause to arrest defendant—not whether the procedural rules were followed. As the trial court was satisfied there was probable cause based on defendant's palm print and the victims' statements, he denied the motion.

B.

"An arrest—the most significant type of seizure by police—requires probable cause and generally is supported by an arrest warrant or by demonstration of grounds that would have justified one." State v. Pinson, 461 N.J. Super. 536, 548 (App. Div. 2019) (quoting State v. Rosario, 229 N.J. 263, 272 (2017)). "Like a search warrant, an arrest warrant is presumed valid, and a defendant challenging its validity has the burden to prove there was no probable cause supporting the issuance of the warrant." Ibid. "For probable cause to arrest, there must be probable cause to believe that a crime has been committed and 'that the person sought to be arrested committed the offense.'" State v.

33

Chippero, 201 N.J. 14, 28 (2009) (quoting Schneider v. Simonini, 163 N.J. 336, 363 (2000)).

"Probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." Pinson, 461 N.J. Super. at 549 (alterations in original) (quoting State v. Moore, 181 N.J. 40, 46 (2004)). In making the probable cause determination, which requires "more than a mere suspicion of guilt, but less evidence than is needed to convict at trial," the "court must 'consider the totality of the circumstances when assessing the reasonable probabilities that flow from the evidence submitted in support of a warrant application.'" Ibid. (first quoting State v. Ingram, 230 N.J. 190, 213-14 (2017); then quoting Chippero, 201 N.J. at 27).

Generally, the consequence for violating the probable cause requirement is the exclusionary rule. See State v. Shannon, 222 N.J. 576, 586 (2015) (J. LaVecchia, concurring). One purpose of the exclusionary rule is "to 'uphold judicial integrity' by informing the public that 'our courts will not provide a forum for evidence procured by unconstitutional means.'" Hamlett, 449 N.J. Super. at 176 (quoting State v. Williams, 192 N.J. 1, 14 (2007)). However,

34

"New Jersey courts apply the exclusionary rule <u>only</u> to evidence obtained in violation of a defendant's <u>constitutional</u> rights." <u>Ibid.</u> As we have explained, "[a]pplying the exclusionary rule to errors of . . . minor and technical significance would 'debase the judicial process and breed contempt for the deterrent thrust of the criminal law.'" <u>Id.</u> at 177 (quoting <u>State v. Bickham</u>, 285 N.J. Super. 365, 368 (App. Div. 1995)).

We are not persuaded by defendant's argument that there was no probable cause to arrest. From the victims' statements, the officers knew that a home invasion occurred and that a gun had pointed at the victims and their child. They also knew from his handprint on the air conditioner unit that defendant was at the very least involved, especially because the air conditioner unit was pushed inside the home to gain access. These facts amounted to probable cause; they did not need to amount to enough to convict defendant. <u>Pinson</u>, 461 N.J. Super. at 549.

As to the procedural issue, the exclusionary rule is reserved for constitutional deprivations—not technical procedural violations. <u>See</u> <u>Hamlett</u>, 449 N.J. Super. at 177. The alleged errors here, such as the municipal judge not recalling whether he administered the oath to the affiant and not reviewing the

35

warrant, do not mandate exclusion. Because the warrant was supported by probable cause, there was no reason to suppress defendant's statement.

## VI.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION