**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2695-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TIMOTHY J. CANFIELD,
a/k/a TIMORTH CANFIELD,

    Defendant-Appellant.

_____

Submitted December 6, 2023 – Decided January 23, 2024

Before Judges Currier and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-12-3619.

Joseph E. Krakora, Public Defender, attorney for appellant (Ruth Elizabeth Hunter, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Rachel Maureen Lamb, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This case returns to us after remand. Defendant was convicted at trial of aggravated manslaughter and related offenses arising from an altercation during which defendant fatally shot the victim with a bow and arrow. In his initial appeal, defendant raised numerous contentions, including the trial judge erred by failing to sua sponte exclude hearsay testimony concerning an alleged family plan to support a fabricated claim of self-defense. We issued a published opinion, State v. Canfield, 470 N.J. Super. 234 (App. Div. 2022), aff'd as modified, 252 N.J. 497 (2023), rejecting most of defendant's trial error contentions but ordering a limited remand for the judge to conduct a N.J.R.E. 104 hearing to determine whether the co-conspirator exception to the hearsay rule applied.

In his initial appeal, defendant also argued he was entitled to a new sentencing hearing for the trial court to retroactively apply a then recently enacted statutory mitigating factor accounting for a defendant's youth, N.J.S.A. 2C:44-l(b)(14). At the time of our prior opinion, the issue of whether the youth mitigating factor applies retroactively was pending before the Supreme Court. Because we were already ordering a remand to address the hearsay issue, "we deem[ed] it prudent for the trial court" to "also consider whether the sentence would have been different accounting for the new statutory mitigating factor[,]

. . . obviat[ing] any need to remand the case yet again if the Supreme Court decides that the new mitigating factor applies retroactively." Canfield, 470 N.J. Super. at 258.

Our Supreme Court granted defendant's petition for certification[1] and affirmed our decision, modifying one of our recommendations relating to an issue not relevant to this appeal. See Canfield, 252 N.J. at 505. On remand pursuant to our opinion, the trial judge determined the State had not established the co-conspirator exception to the hearsay rule applied. Because defendant did not object to the hearsay testimony when it was presented at trial, the improper admission of that evidence must be reviewed for plain error, Rule 2:10-2. The trial judge concluded the admission of the hearsay testimony did "not raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Applying a de novo standard of review, we agree with the trial court's thorough and cogent analysis. We affirm defendant's convictions.

With respect to the sentencing issue, our Supreme Court ultimately determined the youth mitigating factor does not apply retrospectively. State v. Lane, 251 N.J. 84 (2022). Accordingly, we affirm the sentence originally imposed.

---

[1] 251 N.J. 38 (2022).

## I.

We briefly summarize the procedural history leading to this appeal. In September 2016, defendant was charged by indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); three counts of third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b) (1), (3), and (4); and third-degree tampering with witnesses, N.J.S.A. 2C:28-5(a)(1).

In April 2019, Judge David M. Ragonese presided over the jury trial. The jury acquitted defendant of knowing/purposeful murder but found him guilty of the lesser-included offense of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). The jury also found defendant guilty of third-degree possession of a weapon for an unlawful purpose and three counts of hindering apprehension or prosecution. Defendant was acquitted of the witness tampering charge.

In June 2019, defendant appeared before Judge Ragonese for sentencing. The judge merged the convictions for aggravated manslaughter and possession of a weapon for an unlawful purpose. On the merged counts, the judge sentenced defendant to an eighteen-year term of imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court imposed a three-year prison term on each of the

three hindering convictions and ordered them to be served concurrently with each other and the sentence imposed on the aggravated manslaughter conviction.

On January 10, 2022, we issued a published opinion rejecting all but one of defendant's contentions with respect to trial errors. We determined the record was insufficient to resolve defendant's contention, raised for the first time on appeal, the jury was allowed to hear inadmissible hearsay testimony. As noted, we ordered a "limited remand for the trial court to conduct a Rule 104 hearing to determine whether the elements of the co-conspirator exception to the hearsay rule ha[d] been satisfied" with respect to "admitted hearsay testimony regarding an alleged family plan to support a fabricated claim of self-defense." Canfield, 470 N.J. Super. at 257-58. We instructed the trial court:

> The remand shall be completed within ninety (90) days of this opinion. We do not retain jurisdiction. If the trial court determines that the statement is inadmissible, the court shall order a new trial unless the court concludes that the admission of this testimony was not capable of producing an unjust result given the other proofs, the prosecutor's summation, and whether defense counsel's decision not to object was a strategic decision. Following the issuance of the trial court's ruling on remand, the parties shall have forty-five (45) days within which to appeal an adverse ruling.

> We by no means prescribe the outcome on remand and nothing in this opinion should be construed as expressing our view on whether D[i]Filippis' testimony falls within the co-conspirator exception or,

5

if not, whether its admission constituted plain error capable of producing an unjust result. R. 2:10-2.

[Id. at 335-36.]

Defendant appealed our opinion to the Supreme Court, which granted certification on the limited issue of whether a trial court is required to sua sponte instruct the jury on passion/provocation manslaughter when a defendant raises self-defense in a homicide trial. On January 11, 2023, the Supreme Court ruled a trial court is not required to instruct the jury on passion/provocation manslaughter when self-defense is raised in a homicide trial unless this charge is "clearly indicated" by the facts in evidence. Canfield, 252 N.J. at 501. The Supreme Court affirmed our determination that the trial court did not err by not charging the jury on passion/provocation manslaughter sua sponte. Ibid.

On March 23, 2022, Judge Ragonese convened the Rule 104 hearing per our remand order. On April 8, 2022, he issued a seventeen-page written opinion in which he determined the admission of the hearsay evidence at trial was error because the State failed to establish the co-conspirator exception to the hearsay rule applied. However, Judge Ragonese also found the hearsay testimony the jury heard "was not clearly capable of producing an unjust result," Rule 2:10-2, considering the overall strength of the State's case.

The present appeal from the trial court's remand decision follows. Defendant raises the following contentions for consideration:

POINT I

THE REMAND COURT IMPROPERLY ACTED AS THE "THIRTEENTH JUROR," AND WAS WRONG THAT THE ERRONEOUS ADMISSION OF HEARSAY TESTIMONY WAS NOT PLAIN ERROR. THE HEARSAY WAS "CENTRAL" TO THE STATE'S BURDEN TO DISPROVE SELF-DEFENSE, AND THIS WAS A "CLOSE CASE," WITH A "PITCHED CREDIBILITY BATTLE," AND CONTRADICTORY EVIDENCE SUCH THAT THERE WAS "REASONABLE DOUBT" IN THE JURY'S VERDICT.

POINT II

THE REMAND COURT VIOLATED THIS COURT'S ORIGINAL REMAND THAT IT WAS TO "CONSIDER WHETHER THE SENTENCE WOULD HAVE BEEN DIFFERENT ACCOUNTING FOR THE NEW MITIGATING FACTOR," BECAUSE THE REMAND COURT ONLY CONDITIONALLY STATED THAT IT "WOULD" LOWER DEFENDANT'S SENTENCE BASED ON THIS FACTOR BUT DID NOT ACTUALLY RESENTENCE DEFENDANT.

II.

The pertinent facts adduced at trial were detailed in our prior opinion and in the Supreme Court's opinion. For the reader's ease of reference and to provide

7

context for our decision regarding plain error—which accounts for the strength of the State's case—we reproduce the facts set forth in our prior opinion:

> On January 28, 2013, Trisha Dulin and Vincent D[i]Filippis were sitting outside of the Dulin residence at an outdoor bar. Trisha[2] and D[i]Filippis were socializing for the first time since they had graduated from high school. At approximately 10:00 p.m., Trisha saw K.P.[3]—her former boyfriend and the father of her child—standing in the backyard. K.P. and Trisha had ended their relationship just a few weeks earlier.
>
> D[i]Filippis knew K.P. from high school but had not seen him since graduating. K.P. approached D[i]Filippis and a physical fight ensued, resulting in scrapes and bloody knuckles. The fight was short-lived and ended when Trisha admonished K.P. that their relationship was over. Trisha then went inside the house with D[i]Filippis. K.P. remained outside in the driveway.
>
> Trisha informed her family that K.P. had not left. Ashley Dulin (Trisha's sister) and defendant (Ashley's husband) came out of their bedroom. According to Ashley, her family disliked K.P. because "he got [Trisha] into . . . drugs." Ashley further explained that K.P. was suspected of stealing from their house, and that defendant was angry at K.P. because he "wasn't supposed to be there."

---

[2] Due to the testimony and involvement of multiple members of the Dulin family, we referred to family members by their first names to avoid confusion. We intend no disrespect in doing so.

[3] Pursuant to Rule 1:38-3(f)(7), the victim is referred to by his initials.

At this point, Trisha, Ashley, D[i]Filippis, and defendant went outside and began to argue with K.P. After arguing with K.P. for several minutes, the four went back inside the house. K.P. remained outside the residence. Defendant retrieved a compound bow and arrows and went back outside to confront K.P.

During the one-on-one confrontation that followed, defendant shot an arrow that struck and mortally wounded K.P. Defendant followed K.P. as he staggered into a neighbor's yard. The neighbor, Joseph Cassise, came out of his house to investigate the noise. Cassise asked if K.P., who was lying on the ground, was okay. Defendant told Cassise that he and K.P. had "been drinking." Cassise then went back into his house.

Shortly after, defendant returned inside his house and said, "I shot an arrow. I don't know what happened." According to Ashley, defendant told her "he shot [an arrow] at the fence to scare [K.P.]."

Defendant testified at trial in his own defense. He claimed that he went outside armed with the bow and arrows because he "was afraid of [K.P.]" and "didn't know what [K.P.] was going to do." Defendant yelled at K.P. "again and again to leave," but "he wouldn't leave." Defendant testified that K.P., who was approximately thirty feet away, "started coming towards me, and he pulled something out of his pocket." Defendant acknowledged that because it was dark, "I couldn't really tell what it was." He nonetheless believed that K.P. had pulled out an HIV-infected needle because of a recent text message in which K.P. acknowledged he was HIV-positive. Defendant testified that he assumed the object K.P. was holding was a syringe because K.P. had been in possession of a needle the last time police removed him from the Dulin residence.

9

When asked about K.P. approaching him, defendant testified:

> I started backing up away from him, and at the point—I backed into—we have a ledge in front of our shed, I backed into that and started to lose my balance, let go of the bow string, and ended up shooting. I didn't want to hold onto the bow while I was falling down.

Defendant had told police that the bow "wasn't even fully drawn. It was just tension on the string and when I pulled back[,] I guess I tripped." Defendant testified, however, that he did not accidentally shoot the arrow at K.P. Rather, defendant testified that he shot the arrow intentionally as a "warning shot" and that he intended "to scare him."

A neighbor, Bertram Francks, testified that he heard arguing and fighting outside around 10 p.m. Francks observed defendant come outside with a bow and yell at someone. He saw defendant aim the bow but did not see him back up or trip. Francks also saw defendant walk back inside the Dulin residence holding the bow and looking distraught.

Cassise also heard noise coming from the Dulins' backyard that evening. He heard someone say: "What, are you going to shoot me with that?" He then heard "some groans underneath [his] bedroom window" and "[i]t sounded like somebody was in distress." Cassise believed he heard someone say he had been shot with an arrow and subsequently had his son call 9-1-1. As previously noted, Cassise testified that he went outside and asked defendant if everything was okay. Defendant responded that everything was fine and that he and K.P.

10

had been drinking. Cassise then went back into his home. At or around this time, defendant called 9-1-1 using K.P.'s cellphone. He pretended to be K.P., telling the 9-1-1 operator, "I've been shot."

At approximately 10:50 p.m., officers from the Berlin Police Department were dispatched to the scene. Upon their arrival, the officers found K.P. lying face down in a neighbor's yard.

Police questioned D[i]Filippis and Trisha at the Dulin residence and detained them in separate police vehicles after they provided conflicting statements. Trisha initially told the police that she had not seen K.P. in weeks and did not know why the officers had been dispatched to the residence. D[i]Filippis also lied to the police initially, later explaining that he was concerned that they had been called because he and K.P. had been fighting. He told police initially that his knuckles were bloody from engaging in sexual activity with Trisha. Trisha disputed that statement. Police then transported them to the police station to be interviewed.

Prior to transporting D[i]Filippis and Trisha to the police station, the police knocked on the door of the Dulin residence. Defendant answered and then notified Helen Dulin, the homeowner, that police wanted to search Trisha's bedroom. This was defendant's first interaction with police that night. After obtaining consent to search the bedroom, the police requested that Ashley and Helen come to the police station to provide statements. Defendant remained at the Dulin residence while the other individuals were being interviewed at the police station.

Defendant eventually went to the police station in the early morning hours of January 29, after Ashley and Helen had returned home following their

11

interviews. While at the police station, defendant participated in two interviews. During his second interview, defendant revealed that he had lied during his first interview. Defendant testified at trial that he lied (1) about being asleep after the altercation with K.P., (2) that he was not outside during the altercation, (3) that he had never left the premises that night and had not followed K.P. onto the neighbor's property, and (4) that he had not spoken to any of the neighbors. When questioned further, defendant admitted that he did speak with Cassise after the altercation and lied when he explained to Cassise that K.P. was on the ground because he was drunk rather than because he had been shot with an arrow. Additionally, defendant admitted to police that he used K.P.'s phone to call 9-1-1 after the altercation and pretended to be K.P., telling the 9-1-1 operator that he was shot.

During the second interview, defendant disclosed that he had discarded the bow in a wooded area a few miles from the police station. He told police he did this because he was "scared" and "panicked." Defendant agreed to take the officers to the location where he had discarded the weapon. After police recovered the bow, they took defendant back to the Dulin residence where he re-enacted his version of events. The re-enactment was videorecorded.

As previously noted, police went to the Dulin residence to search Trisha's bedroom. They found suspected drugs and an orange-capped syringe. That syringe was identical to an orange-capped syringe found outside when police conducted a follow-up inspection of the crime scene.

In August 2016—more than three years after K.P.'s death—D[i]Filippis revealed conversations involving members of the Dulin family that allegedly

12

occurred shortly after their police interviews had concluded on the night of the incident. D[i]Filippis testified:

> So, the day we got out of the police interrogation from when everything happened, that following morning, we were at the police department that night on [January] 28th, for about [nine] hours. The next morning, the police had drove me and Trish back to the house in the police car, both of us. So[,] when we got to the house, Mr. [Thomas] Dulin [defendant's father-in-law] was there waiting for us. And, when we got out of the car and the cops had left everything and we got inside and settled down, there was kind of like a family meeting of everybody that was involved. And they came up with the story that we're going to say [K.P.] had an HIV[-]positive needle, so it was self-defense instead of him just shooting an arrow at somebody he didn't like. And everybody spoke about it. And I guess they had came to kind of an agreement that that's what we're going to say, and we're going to plead self-defense on this, try to get [defendant] the least time possible for what happened.

D[i]Filippis further testified that a few days before he disclosed this information to police in 2016, defendant and Ashley repeatedly reached out to him to discuss the plan that had been "concocted in a living room." D[i]Filippis testified that when he spoke to defendant on the phone, "[i]t was kind of like stick to the story type thing." D[i]Filippis stated, "[a]nd[,] he kept saying, [s]tick to the story [and go] pick up my

13

copy of the statement so I—[D[i]Filippis]—know exactly what was said, blah, blah, blah."

Defendant and members of the Dulin family denied that the meeting described by D[i]Filippis ever happened. Ashley testified that she first heard about K.P. having a syringe at defendant's arraignment. She denied that she or defendant had advised D[i]Filippis to lie about what happened on the night of K.P.'s death. Thomas Dulin testified and also denied that the meeting described by D[i]Filippis had ever occurred. He testified that he never instructed members of his family to concoct a story about self-defense and a hypodermic syringe.

[Canfield, 470 N.J. Super. at 261-66 (alterations in original).]

### III.

In accordance with our remand order, Judge Ragonese convened a Rule 104 hearing on March 23, 2022. The State called one witness—DiFilippis. The State also introduced into evidence: a postcard written by DiFilippis post-marked April 8, 2013; electronic messages between Ashley and DiFilippis; call records from DiFilippis's cell phone; and a photograph of a hypodermic needle. Defendant did not call any witnesses.

In his written opinion, Judge Ragonese recounted the hearing evidence in his findings, noting:

Mr. DiFilippis testified about the "meeting we had when I got back from the police station" the

morning after the homicide. The meeting involved the "whole family," who Mr. DiFilippis identified as Ashley Dulin, Trisha Dulin, Thomas Dulin, and Helen Dulin. Defendant was not present at the meeting. According to Mr. DiFilippis, Thomas Dulin "led the whole conversation." Mr. DiFilippis attributed the following statements to Thomas Dulin:

> What we're going to do is, we're going to say [the victim] came at defendant with this HIV-positive needle and that [defendant] was just defending himself, and that is all that happened. And [defendant] will get the minimum time the law will allow.

Mr. DiFilippis believed that the strategy behind the self-defense story was the Dulin family's acceptance that defendant was going to serve a prison sentence, and self-defense would lower the amount of time defendant would spend in prison. Even though Mr. DiFilippis was not a witness to the homicide, he testified that the story was not true, and Mr. DiFilippis "knew" it was not self-defense.

This family meeting occurred on or around January 28, 2013. About three months later, in April 2013, Mr. DiFilippis was arrested and charged, along with Trisha Dulin and another person, with burglary. Mr. DiFilippis was unable to post bail and was therefore detained in the Camden County Correction Facility pending his trial. While detained, Mr. DiFilippis mailed Trisha Dulin a postcard in which he wrote, "I know the truth. Remember I have a lot of control over the other case." Mr. DiFilippis explained he was referring to the homicide. The "truth" Mr. DiFilippis referred to in the postcard was his belief that defendant did not act in self-defense.

15

Over the next three years, Mr. DiFilippis did not discuss the self-defense story with any member of the Dulin family. Then, on July 29, 2016, Mr. DiFilippis reached out to Ashley Dulin by way of Facebook Messenger and wrote, "You should prob[ably] call me." On July 30, 2016, Ashley reached Mr. DiFilippis by phone and they talked for almost five minutes. Mr. DiFilippis did not testify about the content of that call.

On August 1, 2016, Ashley sent Mr. DiFilippis a Facebook message that stated the following:

> [M]y dad has the papers if you wanna stop by and grab them . . . just wanna let you know the prosecutor [sic] has a postcard you wrote [T]rish from jail that says you know the truth . . . most of the postcard is about the robbery just wanted to give you a heads up . . . [T]ims lawyer gave it to her to mess with her because shes a bitch. So theres no surprises and you know what we know[.]

Mr. DiFilippis was confused about the message because it referenced a robbery and he had nothing to do with a robbery. He sought clarification from Ashley, and the Facebook exchanges show that Ashley was referring to Mr. DiFilippis's burglary conviction.

That same day, Mr. DiFilippis received a phone call from Ashley. Defendant got on the phone and Mr. DiFilippis attributes the following statements to defendant: "I want to get past all this. I want to get through all this." Mr. DiFilippis then testified that defendant said, "something along the lines of 'stick to the story' and go with what they were doing."

16

Later that day, defendant appeared at the Camden County Prosecutor's Office to meet with Captain King, an investigator, to prepare for the upcoming trial of defendant. During that meeting, Mr. DiFilippis told Captain King about Thomas Dulin's statements during the family meeting that occurred more than three years earlier.

The photograph the State entered into evidence depicts a hypodermic syringe that police found during a search of Trisha's bedroom. It is the same type of syringe found in the backyard of the Dulin home near the victim's body on the night of the homicide.

[(alterations in original).]

As we explained in our initial opinion, "'[t]he co-conspirator exception to the hearsay rule, embodied in N.J.R.E. 803(b)(5), provides that statements made "at the time the party and the declarant were participating in a plan to commit a crime" and "made in furtherance of that plan," are admissible into evidence against another member of the conspiracy.'" Canfield, 470 N.J. Super. at 332 (citations and quotations omitted). A hearsay statement is admissible under the co-conspirator exception if the following conditions are met: "'(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be "evidence, independent of the hearsay, of the existence of the conspiracy and

17

defendant's relationship to it."'" Ibid. (quoting State v. Savage, 172 N.J. 374, 402 (2002)).

Based on the evidence presented at the remand hearing, Judge Ragonese determined the co-conspirator exception to the hearsay rule did not apply, primarily because DiFilippis lacked credibility. The judge found DiFilippis's delay in reporting the conspiracy to police, his convictions for forgery and credit card fraud, and his testimony that "he knew defendant did not act in self-defense" made his testimony "totally unreliable" and "not believable." Furthermore, DiFilippis was not present when the homicide occurred and there was no evidence presented during the hearing or at trial that defendant told DiFilippis he did not act in self-defense.

Judge Ragonese also noted DiFilippis was motivated to lie after Trisha threw him "under the bus" for the burglary for which they were both arrested. DiFilippis admitted to police that he was telling them about the alleged conspiracy because he wanted to "throw Trisha's family under the bus." The judge concluded "[b]ecause he presented himself so incredibly . . . Mr. DiFilippis's testimony about the conspiracy lacked any evidential value."

Judge Ragonese also found the State failed to prove defendant had any relationship to the conspiracy because defendant was not present at the family

meeting. Furthermore, only Ashley and DiFilippis corresponded via Facebook messenger. The only evidence concerning defendant's involvement in the alleged coverup was DiFilippis's testimony that defendant spoke to him on the phone three years after his arrest and told him "something along the lines of 'stick to the story' and go with what they were doing." Judge Ragonese thus concluded the State failed to prove defendant was involved in a conspiracy.

Having determined the co-conspirator exception did not apply, Judge Ragonese concluded the hearsay testimony should not have been admitted. The judge acknowledged our remand instruction that because defendant failed to object to the hearsay testimony at trial, its admission, if deemed on remand to be improper, must be reviewed under the plain error standard, Rule 2:10-2.[4] Applying that standard, and considering the overall strength of the State's case, Judge Ragonese concluded the admission of the hearsay testimony did "not raise

---

[4] We note that in our initial opinion, "we declin[ed] to apply the general principle that hearsay, which is subject to a well-founded objection, is generally evidential if no objection is made." Canfield, 470 N.J. Super. at 331. "Rather," we explained, "because this is a criminal matter affecting substantial rights, we instead follow the lead of our Supreme Court in State v. Frisby, which noted that '[b]ecause no objection was advanced with respect to [the] hearsay evidence [introduced] at trial, it must be judged under the plain-error standard: that is, whether its admission "is of such a nature as to have been clearly capable of producing an unjust result."" Ibid. (quoting State v. Frisby, 174 N.J. 583, 591 (2002)); R. 2:10-2.

a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."

The judge then proceeded to carefully explain the reasons for that conclusion. He noted "the jury could have concluded that defendant did not act in self-defense because he did not retreat." The judge stressed the evidence at trial established that both defendant and victim were outside the residence when the homicide occurred, and "the victim was at least thirty feet away from defendant when he was alleged to have lunged at defendant with a syringe in his hand." Judge Ragonese reasoned "the jury might have completely accepted that the victim lunged at defendant with a syringe, and still found that defendant did not act in self-defense because he could have retreated into his home . . . given the distance between the victim and defendant . . . ." The judge characterized the evidence supporting defendant's ability to retreat with complete safety as "strong," highlighting a video-recording of defendant recreating the events of that night for police.

Judge Ragonese further noted DiFilippis's testimony regarding the alleged fabricated self-defense theory was weakened by effective cross-examination and by trial testimony from defendant, Ashley, Thomas, and Trisha. The judge also highlighted that "defense counsel could have strategically decided to point out

20

that Mr. DiFilippis could not be believed when he testified that there was a conspiracy to concoct a self-defense story on behalf of defendant." Lastly, the judge underscored "the limited emphasis the State placed upon the hearsay testimony in closing" in support of his conclusion the admission of the hearsay statements in DiFilippis's testimony was not clearly capable of producing an unjust result.

IV.

In this appeal, neither the State nor defendant take issue with the trial judge's co-conspirator hearsay exception analysis and his ultimate determination the hearsay exception did not apply. The issue before us is whether the admission of the hearsay testimony constitutes plain error necessitating a new trial.

As a general matter, appellate courts "defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "Under that deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

But this appeal involves an uncommon, if not unique, situation where an appellate court is tasked with reviewing a trial court's plain error analysis.

21

Neither parties' brief addresses the question of what standard of review we apply to Judge Ragonese's conclusion the admission of the hearsay does not rise to the level of plain error. An appellate court generally gives deference to a trial court's factual findings and credibility determinations in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). But it is also well-settled that legal conclusions to be drawn from those facts are reviewed de novo. State v. Radel, 249 N.J. 469, 493 (2022). See also Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting appellate courts are not bound by a trial court's interpretations of the legal consequences that flow from established facts). We deem the trial court's plain error analysis to be a legal conclusion drawn from the facts. Accordingly, we apply a de novo standard of review and address the question of whether the improper admission of DiFilippis's hearsay testimony constitutes plain error with a fresh set of eyes. Cf. State v. S.S., 229 N.J. 360, 379 (2017).

An unchallenged error constitutes plain error if it was "clearly capable of producing an unjust result." R. 2:10-2. "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "In the context of

a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. G.E.P., 243 N.J. 362, 389-90 (2020) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Importantly, "[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

Although we afford no special deference to the trial judge's plain error analysis, we find it detailed and persuasive. The State presented overwhelming evidence at trial, independent of DiFilippis's hearsay testimony, to disprove defendant's self-defense theory. Defendant admitted at trial the victim was thirty feet away when the fatal arrow was released. Relatedly, we held in our initial opinion that as a matter of law, defendant was not in his residence and therefore he had a legal duty to retreat before employing lethal force in self-defense. Canfield, 470 N.J. Super. at 310-11. As Judge Ragonese aptly explained, "the jury might have completely accepted that the victim lunged at defendant with a syringe, and still found that defendant did not act in self-defense because he could have retreated into his home . . . given the distance between the victim and defendant. . . ." Stated another way, the jury did not have to believe

23

defendant's self-defense theory was fabricated to reject it. Indeed, if, as we must assume, they followed the law of self-defense as it was explained to them, they could have rejected the affirmative defense on the grounds defendant had an opportunity to safely retreat—a conclusion for which there was abundant evidence corroborated by defendant himself.

We add there is no indication the jury was swayed by DiFilippis's testimony. To the contrary, the jury had ample reason to discount his testimony based on skilled cross-examination that highlighted he waited three years to report the allegedly fabricated self-defense theory. Furthermore, the testimony of defendant, Ashley, Thomas, and Trisha directly contradicted DiFilippis's account of a family conspiracy. Importantly, moreover, the jury acquitted defendant of the witness tampering charge, suggesting it discounted DiFilippis's testimony defendant fabricated the self-defense theory and pressured him to lie.

In the final analysis, considering the overwhelming evidence that defendant fired the fatal arrow and evidence that disproves the lawful use of deadly force in self-defense, we conclude the hearsay remarks made by DiFilippis afford no basis to overturn defendant's aggravated manslaughter conviction under the plain error doctrine.

V.

24

Finally, we turn to defendant's argument that he is entitled to be resentenced by reason of the mitigating factor accounting for a defendant's youth. N.J.S.A. 2C:44-1(b) provides in pertinent part, "[i]n determining the appropriate sentence to be imposed on a person who has been convicted of an offense, the court may properly consider the following mitigating circumstances . . . [t]he defendant was under [twenty-six] years of age at the time of the commission of the offense." It is not disputed defendant was under twenty-six years of age at the time of the offense. Nor is it disputed he was sentenced in June 2019, months prior to the provision's effective date of October 19, 2020. L. 2020, c.110.

At the sentencing proceeding, the trial judge merged the aggravated manslaughter and weapon possession convictions and sentenced defendant to an eighteen-year prison term, subject to NERA. The judge also imposed a three-year prison term on each of the three hindering convictions and ordered them to be served concurrently with each other and the sentence imposed on the aggravated manslaughter conviction.

In imposing the sentence, the judge found aggravating factor one, N.J.S.A. 2C:44-1(a)(1) (the "nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in

25

an especially heinous, cruel, or depraved manner"); aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the "risk that the defendant will commit another offense"); and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the "need for deterring the defendant and others from violating the law").

As to mitigating factors, the judge found mitigating factor five, N.J.S.A. 2C:44-1(b)(5) (the "victim of the defendant's conduct induced or facilitated its commission"); mitigating factor eight, N.J.S.A. 2C:44-1(b)(8) (the "defendant's conduct was the result of circumstances unlikely to recur"); and mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (the "imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents"). Additionally, the court found mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12) (the "willingness of the defendant to cooperate with law enforcement authorities") with respect to the three hindering convictions. The judge "gave minimal weight to mitigating factor five, de minimis weight to factor twelve, and moderate weight to mitigating factors eight and eleven." In weighing the factors qualitatively, the judge was clearly convinced "the aggravating factors slightly outweighed the mitigating factors."

In defendant's initial appeal, we "affirm[ed] [defendant's] sentence with the caveat that the issue whether the new youthful offender mitigating factor

applies retroactively is presently pending before the Supreme Court." Canfield, 470 N.J. Super. at 258. Because we were already issuing a remand for the trial court to make findings with respect to the co-conspirator exception to the hearsay rule, "we deem[ed] it prudent for the trial court on remand to also consider whether the sentence would have been different accounting for th[at] new statutory mitigating factor. . . . " Ibid.

In accordance with our remand order, Judge Ragonese analyzed whether the application of the youthful offender mitigating factor would change defendant's sentence. He determined if that mitigating factor applied in this case, it would receive minimal weight, and the aggravating factors would still slightly outweigh the mitigating factors. However, the judge also determined that if the new mitigating factor were to be applied retroactively, he would reduce the eighteen-year term of imprisonment on the aggravated manslaughter and weapon possession convictions to a seventeen-year term of imprisonment.

We note Judge Ragonese did not resentence defendant, consistent with our determination the youthful offender mitigating factor would only be relevant in the sentencing equation if the Supreme Court ruled that factor applies retroactively. In Lane, our Supreme Court ruled conclusively the new mitigating factor applies prospectively. 251 N.J. at 87-88. In accordance with our Supreme

Court's definitive interpretation of the statute, there is no basis upon which to grant defendant a new sentencing hearing or to reduce the lawful sentence originally imposed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION